970 F.2d 1523
 140 L.R.R.M. (BNA) 2948, 76 Ed. Law Rep. 726
 Carol WEAVER; Vicki Hahn; Sharron L. Carroll; Angela
Segrist; Lois Kupferberg; Alice Tennenbaum,
Plaintiffs-Appellants (91-3557), Cross-Appellees,
v.
The UNIVERSITY OF CINCINNATI, Defendant,
Joseph L. Steger, President, University of Cincinnati; Jill
Parris, Interim Vice-President for Human Resources and Human
Relations for the University of Cincinnati,
Defendants-Appellees, Cross-Appellants (91-3605),
District 925, Service Employees International Union,
Defendant-Appellee, Cross-Appellant (91-3604).
 Nos. 91-3557, 91-3604 and 91-3605.
 United States Court of Appeals,
Sixth Circuit.
 Argued April 2, 1992.
Decided July 23, 1992.
 
 Glenn M. Taubman, W. James Young (argued and briefed), Nat. Right to Work Legal Defense Foundation, Springfield, Va., J. Michael Dobyns, Rose & Dobyns, Cincinnati, Ohio, for plaintiffs-appellants, Cross-Appellees.
 Eric C. Holzapfel (briefed), C.J. Schmidt (argued), Wood & Lamping, Cincinnati, Ohio, for University of Cincinnati, Steger and Parris.
 Donald J. Mooney, Jr. (argued and briefed), Benesch, Friedlander, Coplan & Aronoff, Cincinnati, Ohio, for District 925, Service Employees Intern. Union.
 Before: KEITH, Circuit Judge; LIVELY and TIMBERS,* Senior Circuit Judges.
 LIVELY, Senior Circuit Judge.
 
 
 1
 This case, brought under 42 U.S.C. § 1983, involves a challenge by nonunion employees of a public employer to the "fair share" or "agency" fees deducted from the plaintiffs' paychecks pursuant to a collective bargaining agreement between their employer and a union that had been certified as the exclusive bargaining representative. The parties filed cross-motions for summary judgment. The district court found that the fair share fee calculation was valid and that the union's ratification procedures and disclosures were constitutionally acceptable in all but two respects. Accordingly, it granted summary judgment to the defendants (individual officials of the public employer and the union) on most issues and summary judgment for the plaintiffs on two issues. Both sides have appealed.
 
 I.
 
 2
 This is the second appeal. The court stated the facts fully in its opinion reversing the district court's denial of the plaintiffs' motion for a preliminary injunction, and we will summarize them briefly here. See Weaver v. University of Cincinnati, 942 F.2d 1039 (6th Cir.1991) (Weaver I ).
 
 A.
 
 3
 District 925, Service Employees International Union (the union), is the duly certified representative of approximately 1200 office employees of the University of Cincinnati. Effective October 1, 1989, the union and the university entered into a collective bargaining agreement, which contained, in Article IV, the following provisions:
 
 
 4
 Section 1. Fair Share. The Union shall fairly represent all employees covered under this Agreement. Therefore, as a condition of employment, employees who are covered under this Agreement shall, within 60 days of employment, or within 60 days of the effective date of this Agreement (whichever is later) either execute a union membership and payroll dues deduction form, or shall have a fair share fee deducted from their payroll checks.
 
 
 5
 * * * * * *
 
 
 6
 Section 3. Hold Harmless. The Union further agrees to save the University harmless from any legal action growing out of these checkoff deductions that may be instituted by an employee involved therein before a court, or any other body asserting or having jurisdiction, against the University as well as reasonable costs and expenses involved in defense of any such action....
 
 
 7
 In accordance with the international union's guidelines for administration of fair share fees, on May 3, 1990, the local union sent a letter to the 408 represented employees who were not union members, explaining that, even if they did not join the union, a fair share fee equal to union dues would be deducted from their paychecks. (Letter of May 3, 1990). The union then explained that employees could "dissent" from such a deduction by sending a letter by certified mail to the local union office within 30 days of receipt of the May 3 letter. Dissenters would be charged a fair share fee equal to 90% of union dues, an amount the union determined included all union expenses fully chargeable to nonmembers under federal law, but excluded: voter registration; members-only benefits; litigation not related to bargaining unit matters; and contributions to charitable and political organizations, political candidates, ideological causes or foreign affairs.
 
 
 8
 The May 3 letter also provided guidelines for nonmembers to "challenge" the fair share calculation, explaining that employees could send a certified letter to District 925's National Secretary within 30 days of the receipt of the May 3 letter. A challenge would cause the union to place the challenger's fair share payments in an interest-bearing escrow account and would invoke an internal appeal procedure whereby a three-member committee (composed of at least two union executive officers) would review the fair share calculations under state and federal law. The May 3 letter further advised that a challenger could appeal the internal committee's decision by notifying the union, which would submit the matter to an impartial arbitrator selected by the American Arbitration Association (AAA). Arbitration proceedings would conform to the AAA's Rules for Impartial Determination of Union Fees.
 
 
 9
 Finally, the May 3 letter included a one-page summary of District 925's Fair Share Calculation for 1989. Although an independent certified public accountant, the Samuel Sindel Company (Sindel), had prepared an audit of the local and national union's expenditures and the fair share calculation, this audit was not included in the May 3 letter. The Sindel audit considered reports from 14 joint bargaining councils to whom District 925 paid fees, which disclosed in general terms how District 925's payments were used. Based on these reports, Sindel concluded that approximately 45% of the fees paid by District 925 in 1989 to the joint bargaining councils was chargeable to nonunion employees. The reports of the joint bargaining councils also were not included in the May 3 mailing to nonunion employees. Instead, nonunion employees were merely informed that "[a]n employee filing a challenge will have the right to inspect any of the financial records at the offices of the Union that formed the basis for the Union's calculations."
 
 B.
 
 10
 District 925 received 157 dissents and 55 challenges from nonmember employees. Beginning in June 1990, the University deducted 90% of District 925's union dues from the paychecks of the 157 dissenters. District 925 placed into an escrow account all of the fees deducted from the 55 challengers' paychecks.
 
 
 11
 Following a hearing before the internal review committee, in which some of the dissenters refused to participate, that committee upheld the 90% fair share fee calculation. When some of the dissenters appealed the committee's decision to District 925's National Secretary, the union requested arbitration by the AAA. The AAA selected an arbitrator. While arbitration was pending, six dissenters filed this action seeking, inter alia, an injunction against all fair share deductions and a declaratory judgment that the indemnification agreement in Article IV, Sec. 3 of the collective bargaining agreement was void.
 
 
 12
 Some of the challenging nonunion employees refused to recognize the arbitrator's authority and requested a postponement of arbitration proceedings until the district court action was concluded. The arbitrator held a hearing without these protestors' participation. Thereafter the arbitrator issued an Interim Award and opinion, finding that most of the information in the May 3 letter satisfied constitutional requirements. The arbitrator did find several defects in the union's notification procedures. First, she found constitutionally inadequate the union's requirement that dissents and challenges be sent by certified mail because it placed too great a burden on the objector, and she determined that ex-post acceptance of other-than-certified mail did not cure the constitutional violation. Second, the arbitrator found that the internal appeal procedure for challengers violated Chicago Teachers Union, Local No. 1 v. Hudson, 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986), because the union did not use impartial hearing officers and because the procedure prevented the challengers from having an expeditious arbitration. Third, the arbitrator found that the use of the word "rebate" in District 925's financial disclosure sheet did not adequately apprise nonunion employees that the money so identified was used to contract for the services of affiliated unions in locations where District 925 did not have an office. The arbitrator enjoined District 925 from continuing any of these practices. She then ordered the union to send to the nonunion clerical employees a "Revised Notice" correcting these errors and offering a new opportunity for challenging and dissenting from the fair share fee to any employee who did not previously dissent or challenge.
 
 
 13
 Pursuant to the arbitrator's orders, District 925 sent a new letter to nonunion employees represented by the union on November 20, 1990. The letter outlined the results of the fair share fee arbitration, and then offered lists of chargeable and nonchargeable union expenses that were virtually identical to the lists in the May 3 letter to nonunion employees. The letter again contained a summary of the audit of District 925's calculation of the fair share fee, and this time District 925 also appended to each letter a full copy of the 1989 Sindel audit. The November 20 letter set forth new dissent and challenge procedures which did not require the use of certified mail and allowed employees to dissent and challenge in the same letter. The renotification letter then provided that any nonmembers who filed dissents or challenges for the first time under the renotification procedure would be rebated the 10% of dues they had been paying since the deductions began.
 
 II.
 
 14
 As noted, the plaintiffs filed this action in the district court while the arbitration proceedings were in progress. When their motion for a preliminary injunction was denied, the plaintiffs perfected an interlocutory appeal to this court (Weaver I ). The parties continued to litigate in the district court pending the outcome of the interlocutory appeal.
 
 A.
 
 15
 The parties engaged in discovery, primarily concerning a motion by the plaintiffs for certification of a class consisting of approximately 400 university employees represented by District 925 for collective bargaining who were not members of the union as of May 3, 1990. On advice of counsel, at her deposition the plaintiff Carol Weaver refused to answer any questions concerning her reason for choosing not to join the union or the content of her discussions with co-workers concerning unionization. She based her refusal on First Amendment and attorney-client privilege grounds.
 
 
 16
 The district court denied the defendants' Motion to Compel Answers to Deposition questions, recognizing that "Plaintiff has First Amendment rights and that no inquiry may be made into matters that are otherwise privileged." Noting, however, that "[t]he underlying philosophy of a class action requires a court to inquire with great particularity into the allegations that a class should be certified," the district court conditionally denied the plaintiffs' Motion for Class Certification. The court gave the plaintiff Weaver an opportunity "to reconsider her position on the questions asked in the deposition" with the option of filing a new motion for class certification upon such reconsideration.B.
 
 
 17
 The district court then ruled on the parties' cross-motions for summary judgment.[1] The district court upheld the method by which the arbitrator was chosen and found that changes in the procedures adopted by the defendants had cured all of the Hudson defects but one. In addition, the district court found that the indemnification provision of the agreement was void as against public policy. More specifically, the district court set forth its seven conclusions of law:
 
 
 18
 1. All of the constitutional deficiencies in District 925's May 3 notice to nonunion employees were cured by the November 20 Renotification.
 
 
 19
 2. The inclusion of the Sindel audit in the November 20 Renotification remedied District 925's failure to include the audit in the May 3 notice.
 
 
 20
 3. "District 925's failure to identify those affiliates to whom it makes payments, and its failure to provide audited financial disclosure of the affiliates' use of these funds, was a violation of the Hudson requirements."
 
 
 21
 4. The arbitrator correctly decided that the fair share fee calculation was valid.
 
 
 22
 5. The collection of agency fees from nonmembers based upon a percentage of their salary is permissible.
 
 
 23
 6. Under Hudson, nonmembers who do not affirmatively challenge or dissent may be charged the full union dues.
 
 
 24
 7. The "Hold Harmless" clause in the collective bargaining agreement is void as against public policy. (citing Tierney v. Toledo, 824 F.2d 1497 (6th Cir.1987)).
 
 
 25
 Weaver v. University of Cincinnati, 764 F.Supp. 1241, 1247-48 (S.D.Ohio 1991).
 
 
 26
 The district court entered its final judgment on May 31, 1991. The parties promptly filed notices of appeal and cross-appeal. All of this occurred after oral arguments but before this court decided the appeal from denial of the plaintiffs' motion for a preliminary injunction.
 
 C.
 
 27
 On August 26, 1991, this court decided the interlocutory appeal, reversing the district court's denial in the plaintiffs' motion for a preliminary injunction. In Weaver I this court found that the procedures outlined in the May 3 letter were constitutionally defective in at least three respects. First, the disclosure concerning payments by District 925 to affiliated unions was inadequate. Second, the objection procedure requiring notice by certified mail was unconstitutionally burdensome. Third, the internal union appeal procedure failed to satisfy Hudson's requirements. 942 F.2d at 1046-47. On the basis of these findings, the court held that the district court erred in concluding that the plaintiffs had failed to establish that they and other nonunion employees represented by the union had suffered irreparable injury.
 
 
 28
 This court reversed the district court's order and remanded the case for the district court to grant the preliminary injunction. Id.
 
 
 29
 Upon receiving this court's mandate in the preliminary injunction appeal the district court entered an order directing the defendants "to cease collecting fair share fees from the wages of Plaintiffs and to return to them all such charges that have been collected to this date together with interest thereon." No notice of appeal was filed from this order, and the defendants filed with the district court a notice of compliance.
 
 III.
 
 30
 When the district court entered its final decision on the merits while the interlocutory appeal was pending, the parties should have made a motion in this court to consolidate the two appeals. Ordinarily, the district court is divested of jurisdiction in a case when one or more of the parties files a notice of appeal. There is authority, however, which holds that an appeal from an interlocutory order does not divest the trial court of jurisdiction to continue deciding other issues involved in the case. See Marrese v. American Academy of Orthopaedic Surgeons, 470 U.S. 373, 379, 105 S.Ct. 1327, 1331, 84 L.Ed.2d 274 (1985) (citing Griggs v. Provident Consumer Discount Co., 459 U.S. 56, 58, 103 S.Ct. 400, 402, 74 L.Ed.2d 225 (1982) (per curiam)); NLRB v. Cincinnati Bronze, Inc., 829 F.2d 585, 588 (6th Cir.1987). Judicial economy is served by merging an appeal from denial of a preliminary injunction with the appeal from final judgment in a case where an appeal from the final judgment is taken prior to a decision on the interlocutory appeal. See, e.g., Ex parte National Enameling & Stamping Co., 201 U.S. 156, 162, 26 S.Ct. 404, 406, 50 L.Ed. 707 (1906); Phoenix Engineering, Inc. v. MK-Ferguson of Oak Ridge Co., 966 F.2d 1513 (1992); United States v. City of Chicago, 534 F.2d 708, 711 (7th Cir.1976). If that had been done in this case a single panel of the court could have decided all the issues. It might have required a second argument, given the sequence of events, but judicial time would have been saved by having all the issues considered and decided by one three-judge panel. Nevertheless, we now have the entire record before us and we will decide all of the issues presented by the parties in this appeal.
 
 A.
 
 31
 The plaintiffs contend that the district court erred in denying their motion for class certification. They argue that they seek to represent all nonmember employees who are "potential objectors" to the agency shop fee and that they will fairly and adequately protect the interests of the class. They assert that they have interests in common with all such nonmember employees because they are only seeking adequate procedural safeguards under Hudson.
 
 
 32
 The plaintiffs frame their argument in terms of being required to waive First Amendment privileges as a condition to obtaining class certification. This refers to the fact that the district court refused to certify the class as requested because the plaintiff Weaver refused to answer questions concerning her motivation for objecting to the agency fee and for bringing this action. The district court pointed out that there could be different reasons for an employee's unwillingness to have deductions from her paycheck paid to a union, and that until the motivation of the plaintiffs is known it is impossible to determine whether or not the plaintiffs can satisfy the requirements of Fed.R.Civ.P. 23 for class representation.
 
 
 33
 Next, the plaintiffs contend that the district court erred in holding that a union may presume consent to fair share payments by those nonmember employees who remain silent rather than filing challenges or dissents. They contend that a nonmember must give specific authority for a union to speak or act on her behalf. The only presumption from silence, they say, is that a nonmember employee declines to have the union collect any money from her in excess of the employee's "pro rata share of the union's costs of collective bargaining, contract administration, and grievance adjustment."
 
 
 34
 The plaintiffs also seek an order requiring the union to refund all fees previously collected, and a permanent injunction against further collections on the ground that the union has never met Hudson's procedural requirements.
 
 
 35
 Finally, the plaintiffs challenge the district court's deference to the arbitrator's decision, arguing that their constitutional claims should have been adjudicated in the federal courts before the arbitrator considered the chargeability of certain union expenditures. They contend that because they were not given the opportunity to participate in the selection of the arbitrator, the AAA proceedings were not a true arbitration. They also assert that the arbitrator's decisions regarding the chargeability of certain items were really decisions pertaining to Hudson's notice requirements and were therefore issues for the district court to decide.
 
 B.
 
 36
 The union maintains that the district court did not abuse its discretion in denying the motion for class certification. The union states that the plaintiffs failed to satisfy their burden of showing that they could adequately represent the interests of all members of the proposed class. They contend that discovery of the plaintiffs' reasons for not joining the union and filing this lawsuit was necessary to determine whether or not their interests were antagonistic to those nonmember employees who did not dissent from or challenge the deduction of the agency fee equal to full union dues and those who dissented from paying nonchargeable items but did not challenge the items that the union deemed chargeable in the agency fee.
 
 
 37
 The union contests the plaintiffs' request for a refund of all of the fees withdrawn from the nonmembers' paychecks, arguing that the employees are only entitled to a refund of that portion of the fee that was determined to be nonchargeable by the arbitrator, which in this case totals approximately 1.15% of the fees withdrawn.
 
 
 38
 Finally, District 925 contests the plaintiffs' attack on the opt-out procedure by which dissenters affirmatively register their opposition to being charged full union dues, arguing that Hudson and our decisions fully support the opt-out procedure.
 
 
 39
 Regarding the validity of the arbitration, District 925 argues that the district court properly considered and affirmed the arbitrator's findings on chargeability issues and maintains that these issues can be considered separately from the notice issues. District 925 also defends its selection of the AAA to appoint an arbitrator unilaterally, asserting that this procedure satisfied Hudson.
 
 
 40
 The university officials, joined by District 925, cross-appeal the district court's determination that the indemnification clause in the collective bargaining agreement was facially void as against public policy. They argue that without such a clause, public employers would be forced to audit unions' finances. They contend that an indemnification clause is facially void only if it is part of a collective bargaining agreement which encourages unconstitutional violations of employees' rights. Finally, both appellees argue that the policy considerations set forth in Abood v. Detroit Bd. of Educ., 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977), will be undermined without indemnification clauses because public employers will refuse to enter into fair share agreements.
 
 IV.
 
 41
 We consider first the issue of class certification.
 
 A.
 
 42
 The plaintiffs contend that the district court erred by refusing to certify the class as requested because they satisfied the requirements for class representatives. They argue that all potential class members have interests in common and that they will provide adequate representation. The defendants respond that the plaintiffs failed to satisfy their burden of demonstrating that they could adequately represent the proposed class. There are factors indicating that various nonmembers have different reasons for refusing to join the union, thus negating commonality of purpose.
 
 
 43
 For example, the record reveals that some university employees had begun to circulate a newsletter called "The Onion" which was dedicated to "peeling away the union facade." The newsletter was intended to challenge any union presence among clerical workers. As the Seventh Circuit Court of Appeals noted in Gilpin v. AFSCME, AFL-CIO, 875 F.2d 1310 (7th Cir.), cert. denied, 493 U.S. 917, 110 S.Ct. 278, 107 L.Ed.2d 258 (1989), when it refused to find that a district court erred in denying certification to a class of nonunion employees:
 
 
 44
 Two distinct types of employee will decline to join the union representing their bargaining unit. The first is the employee who is hostile to unions on political or ideological grounds. The second is the employee who is happy to be represented by a union but won't pay any more for that representation than he is forced to. The two types have potentially divergent aims. The first wants to weaken and if possible destroy the union; the second, a free rider, wants merely to shift as much of the cost of representation as possible to other workers, i.e., union members.
 
 
 45
 875 F.2d at 1313. The publishers of "The Onion" could have interests that conflict with those of other nonunion employees who are merely "free riders." Because the named plaintiffs' motivations are not clear, they may not be able to represent all nonmembers effectively in a class action suit.
 
 
 46
 Further, on appeal, the plaintiffs assert that they only wish to represent the proposed class in order to ensure that their procedural rights under Hudson are protected. However, they sought punitive damages in the lower court and seek on appeal the return of all of the agency shop fees assessed before the union met Hudson's procedural requirements. This court has held that such a recovery would be an unnecessary windfall for the nonunion employees. Lowary v. Lexington Local Bd. of Educ., (Lowary II) 903 F.2d 422, 433 (6th Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 385, 112 L.Ed.2d 396 (1990). The Court of Appeals for the Seventh Circuit in Gilpin described a similar proposed remedy as "punitive" and found that this remedy would only satisfy the wishes of those employees who were hostile to unions. Gilpin, 875 F.2d at 1313.
 
 
 47
 Hence, even if the plaintiffs in this case only wish to guarantee that all nonunion employees' rights under Hudson are protected, their choice of remedy is arguably antagonistic to the wishes of other employees. It is entirely possible that those approximately 243 nonunion employees who did not dissent from or challenge the agency shop fee do not wish to have all of their fees returned.
 
 
 48
 Finally, the Gilpin court noted that certification of the class in such a case was not crucial because once the plaintiffs had secured any relief, it would inure to the benefit of all the members of the proposed class anyway. Id. Such is the case here. For example, the arbitrator's decision that the union's notification to nonmember employees was deficient led to the union's renotification to all of the nonmembers, giving them an additional opportunity to dissent from or challenge the agency shop fees.
 
 B.
 
 49
 Our standard of review when considering a district court's refusal to grant class certification is abuse of discretion:
 
 
 50
 The district court retains broad discretion in determining whether an action should be certified as a class action, and its decision, based on the particular facts of the case, should not be overturned absent a showing of abuse of discretion.
 
 
 51
 Sterling v. Velsicol Chemical Corp., 855 F.2d 1188, 1197 (6th Cir.1988). The particular facts of this case indicate that there was no abuse of discretion.
 
 
 52
 Because the named plaintiffs refused to reveal their reasons for declining to join the union or for bringing this action, there simply was not any information before the court regarding the plaintiffs' motivations for instituting this proceeding. On the other hand, the district court did have some indication that the named plaintiffs' interests could be divergent from those of other members of the proposed class. Furthermore, the district court denied the motion for certification conditionally, and indicated that it would reconsider upon a showing by the plaintiffs that they meet Rule 23's requirements to serve as class representatives. We find no abuse of discretion in the district court's ruling.
 
 V.
 
 53
 The plaintiffs argue that nonunion employees' silence cannot be construed as a waiver of their right to dissent from paying for the union's ideological expenditures with their agency shop fees. Hence, employees should be required to pay only those union costs related to collective bargaining unless they affirmatively consent to pay for the union's political and ideological expenditures. This assumes that the revised notice of November 20 was constitutionally defective. If that notice cured the deficiencies of the May 3 letter, as found by the district court, then a more accurate characterization of the plaintiffs' argument would be that nonmember silence in response to sufficient opportunity for dissenting from paying nonchargeable union expenses indicates acquiescence.
 
 A.
 
 54
 The Abood Court recognized that fair share agreements impinge on nonmember employees' rights, but held that forced contribution, in and of itself, did not violate those employees' rights because the government had strong public policy interests in labor peace and the elimination of "free riders." 431 U.S. at 222, 225, 97 S.Ct. at 1792, 1794. Rather, the Abood Court determined, nonmember employees' First Amendment rights were violated only when their exacted funds were used to support ideological causes which they opposed. Id. at 235, 97 S.Ct. at 1799.
 
 
 55
 Abood adopted the reasoning and rulings in the Supreme Court's earlier Railway Labor Act cases. See Railway Employes' Dept. v. Hanson, 351 U.S. 225, 238, 76 S.Ct. 714, 721, 100 L.Ed. 1112 (1956); International Ass'n of Machinists v. Street, 367 U.S. 740, 744, 81 S.Ct. 1784, 1787, 6 L.Ed.2d 1141 (1961); Brotherhood of Ry. and Steamship Clerks v. Allen, 373 U.S. 113, 122, 83 S.Ct. 1158, 1163, 10 L.Ed.2d 235 (1963). Together these cases stand for the proposition that dissenting union and nonunion members must inform the union that they oppose the use of their funds for ideological expenditures. Considering whether this requirement unconstitutionally burdened the employees in a case involving employees of a public body, the Court determined that a public employee does not have a weightier First Amendment interest than a private employee. Abood, 431 U.S. at 229-30, 97 S.Ct. at 1796-97.
 
 
 56
 Thus the RLA cases and their progeny offer strong reasons to reject the plaintiffs' arguments. See, e.g., Street, 367 U.S. at 774, 81 S.Ct. at 1803 ("dissent is not to be presumed--it must affirmatively be made known to the union by the dissenting employee"); Allen, 373 U.S. at 119, 83 S.Ct. at 1162 (an employee who does not prove he objected to the use of his fees for ideological purposes cannot recover that portion of the fee); Hudson, 475 U.S. at 309, 106 S.Ct. at 1077 ("the nonunion employee has the burden of objection"); see also Damiano v. Matish, 830 F.2d 1363, 1369 n. 8 (6th Cir.1987) ("[t]he burden is on the individual employee to object to expenditures by the Union for political or ideological purposes").
 
 B.
 
 57
 There are practical reasons for rejecting the plaintiffs' argument. First, the Hudson procedural safeguards upon which the plaintiffs rest most of their claim were designed specifically to complement the hierarchy of interests described in Abood:
 
 
 58
 We reiterate that these characteristics are required because the agency shop itself impinges on the nonunion employees' First Amendment interests, and because the nonunion employee has the burden of objection.
 
 
 59
 475 U.S. at 309, 106 S.Ct. at 1077. It follows that if employees did not bear the burden of objection, many of Hudson's procedural safeguards would be less restrictive on the union's collection activity.
 
 
 60
 Second, under Hudson, dissenting employees will never pay for nonchargeable expenses they oppose under the advance reduction system. Id. at 309-10, 106 S.Ct. at 1077-78; see also Tierney v. City of Toledo, (Tierney II) 824 F.2d 1497, 1504 (6th Cir.1987). They will always be given adequate time to object to paying nonchargeable expenses before any money is taken from their paychecks.
 
 
 61
 More importantly, when the union has failed to follow proper notification procedures, the Lowary II court found that an employee's failure to object to the deduction of agency fees did not constitute abandonment of a known right. 903 F.2d at 430. Until Hudson's requirements are satisfied, an employee who does not object to paying for nonchargeable items will be allowed subsequent opportunities to object.
 
 
 62
 The Court of Appeals for the Ninth Circuit recently considered this very issue in Mitchell v. Los Angeles Unified School Dist., 963 F.2d 258 (9th Cir.1992), and reached this same conclusion. After tracing the history of the burden on dissenters to object to the use of their fees for ideological causes, the Mitchell court considered the plaintiffs' argument that the earlier Supreme Court cases were inapposite to their own claim because those cases considered the claims of a mixed group of employees--both members and nonmembers of the union. According to the Mitchell plaintiffs, because they were all nonmembers, they could be assumed to disagree with the union's political activities. The court disagreed:
 
 
 63
 The [Supreme] Court, however, was dealing with an issue of individual constitutional rights and held that all plaintiffs, not just those who were union members, were required to voice their objection to payment of the full agency fee.
 
 
 64
 963 F.2d at 262.
 
 
 65
 The court then addressed the nonunion plaintiffs' argument that their right not to pay for activities unrelated to collective bargaining was analogous to a criminal defendant's fundamental constitutional rights and hence required their intentional relinquishment of the right--an argument almost identical to one made here. The Mitchell court rejected the analogy:
 
 
 66
 The case before us, however, reveals none of the coercive elements so palpable in a police confrontation. The Supreme Court has never suggested that employees who are offered the opportunity to object to the union fee deduction and do not do so act under any compulsion. There is thus no basis, either factual or legal, for the district court's conclusion that plaintiffs were "compelled" to acquiesce, in violation of their First Amendment rights.
 
 
 67
 Id. at 262. The Mitchell court found a closer analogy in the "opt-out" procedure utilized in class action lawsuits and found that such a procedure in this context adequately protected the employees' constitutional rights. An "opt-in" procedure, the court found
 
 
 68
 would unduly impede the union in order to protect the "relatively rare species" of employee who is unwilling to respond to the union's notifications but nevertheless has serious disagreements with the union's support of its political and ideological causes.
 
 
 69
 Id. (citing Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 813, 105 S.Ct. 2965, 2975, 86 L.Ed.2d 628 (1985)).
 
 
 70
 Hence, the plaintiffs' argument must fall because it seeks to shift the balance of interests underlying all of the Supreme Court's pronouncements on the subject of agency shop fees. An "opt-in" procedure would greatly burden unions while offering only a modicum of control to nonunion employees whose procedural rights have already been safeguarded by Hudson.
 
 VI.
 A.
 
 71
 The plaintiffs also seek a return of all fees collected from them under the two union notices. This argument is foreclosed by our decision in Lowary II. In that case we considered the plaintiffs' request for return of all the fees previously paid. We denied the request, explaining that such an award would undermine Abood's policy concern that every employee contribute to the cost of collective bargaining. 903 F.2d at 433 (citing Abood, 431 U.S. at 237, 97 S.Ct. at 1800). The court concluded that Hudson did not disturb the Supreme Court's earlier decision in Allen "that the proper remedy for an unconstitutional fee collection is not a refund of the total fee," but is the refund of the portion of the exacted fees proportionate to the union's nonchargeable expenditures. Id. (citing Allen, 373 U.S. at 122, 83 S.Ct. at 1163). The court added that the plaintiffs' request constituted a misinterpretation of the release of escrowed fees in Lowary v. Lexington Local Bd. of Educ., (Lowary I) 854 F.2d 131 (6th Cir.1988): "[P]laintiffs were not guaranteed a free ride after appropriate procedures for determining the proper fee amount were established." Id. The court reasoned that its decision to "allow[ ] unions to retain the chargeable portions of unconstitutionally collected fair share fees" satisfied the Supreme Court's view of awards in 42 U.S.C. § 1983 actions because the statute was not established to provide " 'a deterrent more formidable than that inherent in the award of compensatory damages.' " Id. (quoting Carey v. Piphus, 435 U.S. 247, 256-57, 98 S.Ct. 1042, 1048, 55 L.Ed.2d 252 (1978)). Finally, the court concluded that its decision was correct because "[t]o allow plaintiffs to recover for both chargeable and nonchargeable expenditures would constitute a windfall to plaintiffs." Id.
 
 
 72
 The plaintiffs appear to argue that Lowary II was based on the mistaken assumption that denying nonunion employees a full refund of chargeable fees for Hudson violations would not serve as encouragement to unions to disregard Hudson. As our earlier decision in this case (Weaver I ) demonstrates, by granting a preliminary injunction barring continuation of fee collecting when a defective notice has been sent, the courts have a quick and efficient remedy for such a Hudson violation. Lowary II is sound law on this point and we see no reason to request reconsideration of its holding by the court sitting en banc.
 
 
 73
 Tierney II dictates that a union cannot exact fees from any nonmember until a plan with all of the procedural safeguards is "established and operating." 824 F.2d at 1504. But here the plaintiffs would have the court extend Tierney II's prospective requirements retrospectively, a suggestion this court clearly declined to adopt in Lowary II.
 
 
 74
 Where chargeable fees have been collected under a plan that does not comport with Hudson, the proper remedy is an injunction. Lowary I, 854 F.2d at 134-35. In the absence of willful or malicious constitutional violations of Hudson's procedures, punitive damages in the form of a full refund of chargeable fees are unwarranted. See Lowary II, 903 F.2d at 433.
 
 B.
 
 75
 The plaintiffs also requested a permanent injunction to prevent the union from collecting any additional agency fees until it followed constitutionally adequate procedures for notification. The district court denied this remedy, noting that the appeal from its denial of a preliminary injunction was pending. Immediately upon receiving the mandate from this court reversing its decision, however, the district court entered a preliminary injunction that is still in place. Thus, the union has not collected any agency shop fees from the nonunion employees since that time (August 1991). In view of our decision that the November 20 notice cured the deficiencies in the May 3 letter, we have no cause to consider the request for a permanent injunction.[2]
 
 VII.
 
 76
 The plaintiffs present two arguments to bolster their contention that the district court erred in ratifying the arbitrator's decision.
 
 A.
 
 77
 First, the plaintiffs assert that the person unilaterally chosen by the AAA could not serve as an arbitrator because the plaintiffs were not allowed to participate in the arbitrator's selection. This contention directly contradicts our approval of this method of choosing an arbitrator in Damiano v. Matish, 830 F.2d 1363 (6th Cir.1987). The Damiano court explained:
 
 
 78
 In the instant case, the AAA itself has defined specific policies to govern the selection of the arbitrator who would hear such challenges. Under its Rules for Impartial Determination of Union Fees, effective June 1, 1986, an arbitrator who has been tentatively selected to hear a challenge must "disclose any circumstances likely to create a presumption of bias." Thereafter, the AAA may elect, in its discretion, to disqualify that individual. In addition, any participant to the proceeding "may challenge an Arbitrator for cause by promptly notifying the AAA of [the] objection." Because the procedure adopted by the Union in this case would provide an opportunity for the participants to challenge the selection of a particular arbitrator for identifiable bias, and because the selection of the arbitrator would not be left solely to the discretion of the Union, this part of the Union's amended policy appears to meet the procedural requirements set forth in Hudson.
 
 
 79
 830 F.2d at 1372. The plaintiffs did not challenge Arbitrator Florman's qualifications or impartiality after she was chosen by the AAA; they merely argued that they should have had a voice in her selection.
 
 B.
 
 80
 The plaintiffs' second argument against ratification of the arbitrator's decision is that an arbitrator should not determine which portion of the exacted fees were chargeable to nonmember employees before a district court decides the merits of a constitutional challenge to the union's collection procedures. While no court has specifically addressed this sequence of adjudication, Hudson and Lowary II imply that this sequence can be satisfactory.
 
 
 81
 In Hudson's discussion of how an "expeditious arbitration" could provide "a reasonably prompt decision by an impartial decisionmaker," the Court added a caveat: "The arbitrator's decision would not receive preclusive effect in any subsequent § 1983 action." 475 U.S. at 308 n. 21, 106 S.Ct. at 1077 n. 21 (emphasis added). Of course, the Hudson Court was envisioning the union enacting a constitutionally adequate plan and then submitting to an impartial decisionmaking process.
 
 
 82
 The validity of determinations made by a satisfactorily-selected arbitrator pursuant to a collection plan with other constitutional infirmities was considered by this court in Lowary II. The court emphasized that the Supreme Court had indicated "that courts should not involve themselves in the factual inquiries involved in making a chargeability determination." 903 F.2d at 433 (citing Allen, 373 U.S. at 123-24, 83 S.Ct. at 1164-65; Abood, 431 U.S. at 240, 97 S.Ct. at 1802). Rejecting the nonunion employees' argument that the arbitration was invalid, the court explained:
 
 
 83
 Clearly, any determination by an independent arbitrator "would not receive preclusion effect in a subsequent § 1983 action." In this case, however, plaintiffs do not claim that the decisionmaker's determinations were improper. Rather, plaintiffs only object to the use of the procedure.
 
 
 84
 We also reject plaintiffs' argument that the use of this "decisionmaker" is an exhaustion of remedies procedure contrary to the teachings of Patsy v. Florida Board of Regents, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982), and other cases which suggest that plaintiffs may bypass all union procedures in a § 1983 challenge. Plaintiffs are not being required to operate under the unconstitutional plan. Rather, the District Court has lifted this procedure from the plan and instituted it as the procedure by which the nonchargeable portions of the improperly collected fees should be determined.
 
 
 85
 903 F.2d at 433-34 (footnote and citation omitted).
 
 
 86
 Lowary II's facts were slightly different from the case before this court. In Lowary II, the district court decided that a union's collection plan violated Hudson and then had the parties submit their chargeability issues to an impartial decisionmaker. Id. at 426. Nevertheless, the arbitrator was chosen in Lowary II and the present case under a plan with constitutional infirmities.
 
 
 87
 It follows from the reasoning of both Hudson and Lowary II that chargeability issues may be decided by an arbitrator whose selection satisfied Hudson, even if other portions of a union's collection plan do not satisfy Hudson, before a district court considers a constitutional challenge to the collection plan. Hence, the arbitrator's finding that "with the exception of the 'Professional Fees & Expenses,' District 925/SEIU met its burden of establishing, with reasonable precision and detail, the constitutionally permissible bases for its chargeability," was properly made before the district court considered the plaintiffs' § 1983 complaint. The plaintiffs were not prejudiced by this procedure because this decision did not have a "preclusive effect" on their federal suit. Contrary to the plaintiffs' argument that the district court "abdicated" its responsibility by considering the arbitrator's findings, it is clear that the district court understood and performed its proper role in the sequence of proceedings. In its opinion the district court noted:
 
 
 88
 The Hudson Court does advise that an arbitration is a legitimate first step in the evaluation of the validity of an agency fee plan. A district court may examine and ultimately ratify determinations made by a properly selected arbitrator upon a finding that an arbitrator's decision was correct.
 
 
 89
 764 F.Supp. at 1245.
 
 
 90
 The plaintiffs also claim that the arbitrator erroneously decided questions of notice, rather than chargeability; that notice issues should have been presented only to the district court. In the present case the arbitrator determined Hudson notice issues in the course of a legitimate adjudication of chargeability issues. These determinations certainly did not have a preclusive effect on the district court, which engaged in a comprehensive examination of Hudson's requirements. Although nonunion employees cannot be required to submit their constitutional claims to an arbitrator, if notice issues are addressed in the course of a "reasonably prompt decision by an impartial decisionmaker" of chargeability issues, Hudson, 475 U.S. at 309, 106 S.Ct. at 1077, and the nonunion employees have the option of presenting those claims anew before a court in a § 1983 action, the nonunion employees' constitutional rights have been protected.
 
 
 91
 The plaintiffs further argue that where the union clearly notifies nonmember employees it is charging them for expenses which either are not chargeable under existing precedent or are subsequently found not to be chargeable, issues of chargeability become notice issues and cannot be considered by an arbitrator. We find this argument to be without merit. Arbitrators determine items' chargeability under the guidance of Supreme Court and court of appeals decisions that set forth the constitutionality of charging various expenses to nonmembers. The arbitrators' decisions are then subject to review by a court at the parties' request. If we were to adopt the plaintiffs' definition of chargeability, we would eliminate entirely the valuable role arbitrators play in evaluating fair share agreements. Inquiries into chargeability are findings of fact, Lowary II, 903 F.2d at 433, and attempting to change their label does not make them issues of law.
 
 
 92
 We find no merit in any of these arguments for requiring the district court to reject the arbitrator's findings and decision. The district court did not abdicate its responsibilities; rather, it followed approved procedures.
 
 VIII.
 
 93
 The defendants cross-appeal from the district court's conclusion that the indemnification clause in the collective bargaining agreement is void as against public policy.
 
 A.
 
 94
 There is a dearth of published opinions at the court of appeals level on the validity of contract provisions that indemnify public employers against liability to employees for unconstitutional acts and practices. In Stamford Bd. of Educ. v. Stamford Educ. Ass'n, 697 F.2d 70 (2d Cir.1982), the court upheld a district court finding that a "hold harmless" clause in a labor agreement that provided a lower pay scale for female coaches in a school system than for their male counterparts was invalid as "patently contrary to civil rights policy." Id. at 71.
 
 
 95
 The Stamford plaintiffs sued under § 1983, seeking relief under both Title VII of the 1964 Civil Rights Act and the Equal Pay Act as well as the Constitution.
 
 
 96
 The court discussed public policy generally and more particularly under federal civil rights laws, and easily concluded that there is a strong public policy against discrimination in employment on the basis of sex. Although the union that agrees to the provision may be held liable independently, nevertheless
 
 
 97
 if the "hold harmless" clause is enforceable, employers will have little reason to be concerned over whether labor agreements discriminate against women, knowing full well that if they are later found to have discriminated, they will be totally compensated for any injuries resulting from the discrimination. Labor unions, on the other hand, will have little incentive to pursue anti-discrimination claims or lawsuits when they are aware that they will have to pay from their own pockets for the fruits of a victory.
 
 
 98
 Id. at 73-74. The court also reasoned that, although the district court had not found that the school board acted willfully in agreeing to the indemnification clause, "the logical reason why the contract contained a 'hold harmless' clause was because at least one of the parties (probably, the Board) thought that there was a good chance that the pay schedule in the Agreement would be held discriminatory." Id. at 74.
 
 
 99
 The Court of Appeals for the Third Circuit dealt with the issue in Hohe v. Casey, 956 F.2d 399 (3d Cir.1992). Like the present case, Hohe was a § 1983 action by nonunion state employees over "fair share" payments to a union. The plaintiffs and the court recognized that the state and high state officials were immune from any claim for damages, but sought declaratory and injunctive relief against implementation of a state statute permitting a fair share agreement between the state and the union that was the exclusive bargaining representative for state employees. The agreement contained an indemnification clause under which the union agreed to hold the state harmless against "all claims, suits, orders, or judgements brought or issued against the Employer as a result of the action taken or not taken by the Employer under the provisions of this Article." Id. at 411. Unlike the clauses in the present case and in Stamford, the clause in Hohe did not indemnify the employer against costs and expenses involved in defending any legal action growing out of the implementation of the fair share provision of the agreement.
 
 
 100
 The Hohe court noted that this court had held an indemnification clause in an agreement between a public employer and a union invalid in an unpublished opinion. See Cramer v. Matish, 924 F.2d 1057 (6th Cir.1990) (Table), discussed infra. The court held, nevertheless, that "invalidation of the indemnification clause is not required by the First Amendment." Hohe, 956 F.2d at 412. The court concluded that the clause did not remove all incentive for the state to ensure that its employees were required to pay only a fair share fee that passed constitutional muster because the state "may be called upon to defend the deduction of fees and may be enjoined from imposing the fair share fees on nonmembers when it is determined that the exclusive representative has not complied with constitutional requirements." Id. at 411. Distinguishing Stamford, the court noted that the clause before it did not indemnify the state for costs or fees involved in defending a claim. The court concluded that even if the union were to indemnify the state for costs and fees, that would not matter because the union, upon whom most of the obligations fall, "has a significant incentive to ensure that its procedures comply with the Constitution." Id. at 412.
 
 B.
 
 101
 As noted earlier, this court held an indemnification clause invalid in Cramer v. Matish, an unpublished decision. The decision appears, however, at 1990 WL 169640. In Cramer we stated:
 
 
 102
 Under Hudson, the public employer, not the union, has the primary duty to ensure that the plan is constitutionally valid. Hudson v. Chicago Teachers Union, 743 F.2d 1187, 1192 (7th Cir.1984), aff'd, 475 U.S. 292 [106 S.Ct. 1066, 89 L.Ed.2d 232] (1986); Lowary v. Lexington Local Bd. of Educ., 704 F.Supp. 1430, 1449 (N.D.Ohio 1987), reversed on other grounds, 854 F.2d 131 (6th Cir.1988). Indemnification clauses in collective bargaining agreements which purport to relieve public employers from liability for violations of federal constitutional and civil rights are void as against public policy. Stamford Bd. of Educ. v. Stamford Educ. Ass'n, 697 F.2d 70, 73-75 (2d Cir.1982). Without such a role, public employers would have no incentive to fulfill their constitutional duties.
 
 
 103
 1990 WL 169640 at * 4.
 
 
 104
 Also, within this circuit, a district court followed Cramer in an action by city firefighters to prevent collection of agency fees. Jordan v. City of Bucyrus, Ohio, 754 F.Supp. 554 (N.D.Ohio 1991). The agreement in Jordan contained an indemnification clause that was similar to the one now before us. Id. at 555. Finding that the clause was facially neutral, the district court nevertheless found it invalid under Cramer. Judge Bell reasoned as follows:
 
 
 105
 A public employer ... has duties under Hudson which are separate and apart from those of the union, and a union's violation of its duties thus cannot form the basis of a public employer's claim for indemnification.... Hudson implicitly recognizes that it is the government employer and the union who share the duty in establishing a constitutionally valid fair share procedure. The union's duty, after all, is derivative to the fact that the employer is a governmental actor. To permit a public employer to escape any duty in the implementation of the plan, would impose a governmental standard of conduct on a purely private entity.
 
 
 106
 Id. at 558.
 
 
 107
 In Jordan the court had previously found that the city had willfully and knowingly violated the plaintiffs' constitutional rights in implementation of the fair share agreement. Under these circumstances it would have violated public policy to permit the city to be indemnified against liability.
 
 C.
 
 108
 Our consideration of the public policy question in the foregoing decisions leads to the conclusion that the district court correctly found that the indemnification agreement in the present case was repugnant to public policy, and therefore, invalid. Unlike the clause in Stamford, the clause in the agreement between District 925 and the university does not appear, on its face, to relieve the employer from all consequences of condoning sex discrimination, or similar civil rights violations. Thus, this clause is facially neutral. It does, however, protect the university from any financial consequences of going along with procedures selected by the union that fail to comply with the constitutional standards enunciated in Hudson, Tierney II and Lowary I and II.
 
 
 109
 While there is no showing that the university willfully sought to deprive its employees of their constitutional rights, we agree with Judge Bell's statement in Jordan that the university as a public employer had duties separate and apart from those of the union. Both parties to a fair share agreement must be held accountable for their responsibility to see that Hudson's commands are followed. A clause that relieves the employer of all consequences for its failure to assume and conscientiously carry out its duties, including even the cost of defending legal actions, is against public policy.
 
 CONCLUSION
 
 110
 We agree with the district court that the union's November 20 renotification cured the constitutional deficiencies in the May 3 letter to nonunion employees. This conclusion does not conflict with the decision of the panel in Weaver I. That panel had before it an interlocutory appeal from denial of a preliminary injunction. In such an appeal, the determinative question is whether the district court abused its discretion in denying an injunction at an early stage in the litigation. The merits of the case are not ripe for decision at that point in the proceedings.
 
 
 111
 Furthermore, in this instance the panel reviewing the preliminary injunction issue based its decision solely on the adequacy of the May 3 letter. "[W]e must examine the sufficiency of the May 3 notice, not the November 20 notice." Weaver I, 942 F.2d at 1042. The court indicated in dicta that the November 20 renotification was inadequate for failing to disclose financial information concerning the unions' affiliated state and national labor organizations. Id. The district court reached the same conclusion independently and its final judgment directed the union to disclose this information within 60 days from entry of the judgment.
 
 
 112
 In a motion to stay the judgment, the union advised the district court that it would seek a modification of that portion of the final judgment when this court decided the present appeal and the district court received our mandate. The union advised the district court that audits of all its affiliates were not available, and that in lieu of such audits the union would propose to rebate the entire portion of the agency fee attributable to affiliation charges in 1990, and not to include any affiliation charges in agency fees for 1991 and thereafter. The district court will consider this proposal upon remand.
 
 
 113
 As previously indicated, we reject the plaintiffs' contentions in their appeal from the final judgment and reject the defendants' position on the indemnification clause.
 
 
 114
 The judgment of the district court is affirmed on appeal and cross-appeal and the case is remanded for further proceedings with respect to affiliate charges. No costs allowed.
 
 
 
 *
 The Honorable William H. Timbers, Senior Circuit Judge of the United States Court of Appeals for the Second Circuit, sitting by designation
 
 
 [1]
 The district court dismissed the claims for damages against the university as barred by the Eleventh Amendment. The plaintiffs did not appeal this ruling
 
 
 [2]
 Because the union has offered to rebate that portion of the nonunion employees' fees attributable to payments to affiliates, see Conclusion, infra, any potential infirmity in the November 20 notice regarding affiliate payments does not affect our decision here