WAREHAM EDUCATION ASSOCIATION & others[1] *vs.* LABOR RELATIONS COMMISSION; DAVID DUPUIS & others,[2] interveners.

Suffolk. May 3, 1999. - July 15, 1999.

Present: WILKINS, C.J., ABRAMS, LYNCH, GREANEY, FRIED, MARSHALL, & IRELAND, JJ.

*Labor,* Union agency fee.

This court concluded that there was no basis for a "small union" exception to the requirement of *Chicago Teachers Union, Local No. 1* vs. *Hudson,* 475 U.S. 292, 310 (1986), that unions collecting agency fees provide an independently audited financial statement in connection with their fee demands. [87-89]

The Labor Relations Commission did not exceed its authority by ordering unions to return certain agency shop fees to nonunion members who had challenged unions' agency fee demands as to amount and procedural compliance, where the commission had concluded that the unions' failure to provide audited financial statements in connection with their fee demands was in violation of G. L. c. 150E, §§ 12 and 10 (*b*) (1). [89-90]

APPEAL from a decision of the Labor Relations Commission.

The Supreme Judicial Court granted an application for direct appellate review.

*Ann Clarke* for the plaintiffs.

*John B. Cochran* for the defendant.

*Bruce N. Cameron* for the interveners.

LYNCH, J. The Bridgewater Education Association (BEA), the Wareham Education Association (WEA) and the Fairhaven Education Association (FEA) (collectively, unions) appeal from the decision of the defendant, Labor Relations Commission (commission), requiring them to return certain agency shop

---

[1]Bridgewater Education Association and Fairhaven Education Association.

[2]Eleanor Dupuis, Betsy Ann Wood, Charles Cipollini, and Peter Anthony. A motion to intervene was filed and allowed in the Appeals Court.

fees[3] to nonunion members and precluding them from claiming such fees absent audited financial statements. We granted the plaintiff unions' application for direct appellate review, and we now affirm the commission's ruling.

The interveners, David Dupuis; Eleanor Dupuis; Betsy Ann Wood; Charles Cipollini; and Peter Anthony (collectively, teachers), all teach in school districts represented by the unions. None of the teachers is a member of the respective union representing teachers in the collective bargaining process. In 1989 and 1990, the teachers filed charges with the commission challenging the unions' 1988-1989 agency fee demands as to amount and procedural compliance.[4] On the basis of these complaints, the commission issued separate two-count complaints against each union alleging that each union violated G. L. c. 150E, § 12, by demanding an agency service fee without providing the teachers with an independent auditor's financial statement of its revenues and expenses for the relevant period and by demanding an excessive fee. The commission bifurcated these two counts and, following a hearing, concluded that the unions' failure to provide audited financial statements was in violation of G. L. c. 150E, §§ 12[5] and 10 (*b*) (1).[6] As a result of this conclusion, the commission ordered the unions to

---

[3]Under G. L. c. 150E, § 12, if a public employee union represents nonunion members for collective bargaining purposes, the union may demand a fee for its agency representation.

[4]Betsy Ann Wood also challenged the WEA service fee demands for the 1987-1988 school year.

[5]General Laws c. 150E, § 12, provides in relevant part:

"The commonwealth or any other employer shall require as a condition of employment during the life of a collective bargaining agreement so providing, the payment on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is later, of a service fee to the employee organization which in accordance with the provisions of this chapter, is duly recognized by the employer or designated by the commission as the exclusive bargaining agent for the unit in which such employee is employed; provided, however, that such service fee shall not be imposed unless the collective bargaining agreement requiring its payment as a condition of employment has been formally executed, pursuant to a vote of a majority of all employees in such bargaining unit present and voting.

"Prior to the vote, the exclusive bargaining agent shall make reasonable efforts to notify all employees in the unit of the time and place of the meeting at which the ratification vote is to be held, or any other method which will be used to conduct the ratification vote. The amount of such service fee shall be equal to the amount required to become a member and remain a member in good standing of the exclusive bargaining agent and its affiliates to or from

dissolve the escrow fund in which the teachers' agency fees were being held, and return the withheld fees to the teachers.

The material facts are not in dispute. The unions' agency fee demands for the years in question each included a letter stating that the fees were calculated using actual financial records of the particular local affiliate for the preceding school year. Each contained the following statement along with the respective treasurer's unnotarized signature: "In signing this form, I certify that the information contained herein is a true and accurate reflection of the [local union affiliate's] actual expenditures during the 1987-88 year to the best of my knowledge and ability. Signed under the pains and penalties of perjury." The demands also included an explanation of how the local affiliate calculated its share of the service fee, and a book entitled "MTA and NEA Combined Agency Service Fee Information for 1988-89 and Related Information." This book contained audits by a certified public accountant of the local affiliates' parent associations (the National Education Association and the Massachusetts Teachers Association). None of the demands included independently audited financial statements for the local affiliate requesting payment.

With regard to the years in question, the commission found

which membership dues or per capita fees are paid or received. No employee organization shall receive a service fee as provided herein unless it has established a procedure by which any employee so demanding may obtain a rebate of that part of said employee's service payment, if any, that represents a pro rata share of expenditures by the organization or its affiliates for:

"(1) contributions to political candidates or political committees formed for a candidate or political party;

"(2) publicizing of an organizational preference for a candidate for political office;

"(3) efforts to enact, defeat, repeal or amend legislation unrelated to the wages, hours, standards of productivity and performance, and other terms and conditions of employment, and the welfare or the working environment of employees represented by the exclusive bargaining agent or its affiliates;

"(4) contributions to charitable, religious or ideological causes not germane to its duties as the exclusive bargaining agent;

"(5) benefits which are not germane to the governance or duties as bargaining agent, of the exclusive bargaining agent or its affiliates and available only to the members of the employee organization."

[6]General Laws c. 150E, § 10 (b) (1), provides: "It shall be a prohibited practice for an employee organization or its designated agent to . . . [i]nterfere, restrain, or coerce any employer or employee in the exercise of any right guaranteed under this chapter."

the following facts: The FEA had an approximate income of $29,000 and represented 185 employees, of whom seven were nonmembers. The BEA had an approximate income of $17,900, and represented 116 employees, including two nonmembers. The WEA's approximate income for those years was $9,400, and it represented 205 employees, including one nonmember. The local portion of the fees sought from nonmembers did not exceed $45.

The commission further found:

> "There are three levels or kinds of service that an accountant or auditor can provide of an entity's financial statements: a compilation, a review and an audit. The purpose of these services is to determine and disclose the level of reliance which can be placed on an entity's financial statements. Each level of service consists of three components: a report, a set of financial statements, and notes accompanying the financial statements. Although the financial statements and accompanying notes are generally the same for each level of service, the report differs significantly depending on whether the service performed is a review, a compilation or an audit.

> "A compilation is the lowest level of service and offers no assurance that the numbers listed in the financial statements are fairly stated. In a compilation, an accountant receives financial information from the management of an entity, reviews the figures for clerical errors and records the figures in the form of financial statements. The accountant may also discuss the accounting policy with management and try to identify any issues that were not in conformity with generally accepted accounting principles and issues a report. The accountant is not required to make inquiries or perform other procedures to verify, corroborate or review information supplied by the entity.

> "The review is the next level of service in which an accountant performs limited testing of the figures listed on the financial statements using analytical procedures and inquiries of management. The objective of a review is to provide a reasonable basis for an accountant to express limited assurance that there are no material modifications that should be made to the financial statements. A review

requires no actual testing of documentation. Instead, the accountant reviews the accounting books and journals and relies on verbal inquiries of management. Specifically, the accountant performs an analytical review of the listing of accounts at year end, as well as a comparative analysis from year to year to look for consistency or unusual changes. The accountant also compares actual results to the entity's budget. Depending on whether problems existed with the analysis, the accountant would look for schedules that were tied to the listing of accounts, i.e. at cash to see if a bank reconciliation was completed. Finally, the auditor generates the report, the financial statements, and the note disclosures. Because these procedures are used, the review is more reliable than a compilation.

"The audit is the highest level of service. The objective of the audit is to express an auditor's opinion on the extent to which the financial statements fairly present, in all material respects, the entity's financial position, results of operations and cash flows, in conformity with generally accepted accounting principles.

"An auditor employs the following procedure when performing an audit. First, the auditor reviews the entity's internal controls — its internal procedures and accounting system — to determine the level of risk and the auditor's level of reliance. Based on this information, the auditor determines which testing methodology to use, either the substantive approach or the compliance approach. In the substantive approach, the auditor places no reliance on internal controls and tests all the account balances in detail (over the materiality level) by physically viewing the supporting documentation. For example, the auditor could review every check and invoice written on a particular account to ensure that the amounts matched and proper approval process was followed, using their judgment to determine how many accounts to review. The auditor could also review leases to determine whether payment matched the lease agreement. Conversely, in the compliance approach the auditor relies on internal controls and tests the accounting cycles, thereby reducing the amount of substantive testing that would be necessary.

"In addition, the auditor completes the confirmation

process by sending confirmation requests to banks (for loans or cash), or others for accounts receivable and accounts payable. Finally, the auditor considers subsequent events, such as whether a loss of assets occurred after the fiscal period or whether litigation existed which would substantially change the financial picture.

"There are certain limitations inherent in the auditing process. For example, the American Institute of Certified Public Accountants (AICPA) *Codification of Statements on Auditing Standards* provides in part that:

> " 'Because of the characteristics of irregularities, particularly those involving forgery and collusion, a properly designed and executed audit may not detect a material irregularity. For example, generally accepted auditing standards do not require that an auditor authenticate documents, nor is the auditor trained to do so. Also, audit procedures that are effective for detecting a misstatement that is unintentional may be ineffective for a misstatement that is intentional and is concealed through collusion between client personnel and third parties or among management or employees or the client.' " (Footnotes omitted.)

*Matter of Wareham Educ. Ass'n, Bridgewater Educ. Ass'n, Fairhaven Educ. Ass'n,* 24 M.L.C. 23, 26-27 (1997). The commission noted that the cost of audits for local unions in Springfield, Chicopee, Newton, and Taunton ranged from $2,230.36 to $4,105. *Id.* at 27-28.

It is apparent from the commission's findings that, although there are inherent limitations, the audit provides significantly more verification and reliability than the other accounting options. It is also discernable that the cost of the audits would likely eclipse the agency fees available to the unions under G. L. c. 150E, § 12.

In *Chicago Teachers Union, Local No. 1* v. *Hudson,* 475 U.S. 292, 310 (1986), the United States Supreme Court held that "the constitutional[7] requirements for the Union's collection of agency fees include an adequate explanation of the basis for the

---

[7]The Supreme Court has held that agency fees such as those authorized under G. L. c. 150E, § 12, implicate the First and Fourteenth Amendments to the United States Constitution. *Chicago Teachers Union, Local No. 1* v. *Hud-*

fee, a reasonably prompt opportunity to challenge the amount of the fee before an impartial decisionmaker, and an escrow for the amounts reasonably in dispute while such challenges are pending." In a much discussed footnote apparently intended to clarify what constitutes "adequate disclosure," the Court stated that "[t]he Union need not provide nonmembers with an exhaustive and detailed list of all its expenditures, but adequate disclosure surely would include the major categories of expenses, as well as verification by an independent auditor." *Id.* at 307 n.18.

The unions claim that, because the cost of an audit would be unduly burdensome to these relatively small local affiliates, the commission erred in refusing to recognize an exception to the constitutional requirement set forth in *Chicago Teachers Union, Local No. 1* v. *Hudson, supra.* The unions also contend that, even if no such exception exists, the commission exceeded its authority in issuing its remedial order that all funds should be returned to the dissenting teachers. We disagree and affirm the commission's decision.

1. *Existence of small union exception to the audit requirement.* The unions primarily argue that they should be excused from having to provide independently audited financial statements with their fee demands. Despite urging us to adopt this exception the unions cite no authority suggesting that the Supreme Court did not mean exactly what it said in *Chicago Teachers Union, Local No. 1* v. *Hudson, supra.* Rather, the unions argue that such a requirement would make it impractical to collect the fees. It should be noted however that, although G. L. c. 150E, § 12, permits the collection of agency fees, it by no means requires them to do so.

Moreover, the United States Court of Appeals for the Ninth Circuit recently rejected with criticism the position the unions now urge us to adopt. *Prescott* v. *County of El Dorado,* 177

*son,* 475 U.S. 292, 301-302 & n.9 (1986), citing *Abood* v. *Detroit Bd. of Educ.,* 431 U.S. 209 (1977). This is so because under the color of a State statute, nonmembers may be compelled against their wishes to associate with and perhaps to subsidize the union charged with representing nonmembers' interests in collective bargaining as a condition of public employment. *Chicago Teachers Union, Local No. 1* v. *Hudson, supra.* Nevertheless, the Court has approved the constitutionality of such arrangements in acknowledgment of the government's strong interest in labor peace, so long as fees collected represent only the union's costs incurred in the collective bargaining process, and are not directed toward promoting the union's political agenda. *Id.*

F.3d 1102, 1107-1108 (9th Cir. 1999). In that case, the local union affiliate was only slightly larger than the unions here. *Id.* at 1104. The Federal District Court had concluded that the plaintiffs were not entitled to an audit in light of the local affiliate's size, reasoning that it could "not accept plaintiffs' position that a union must choose between an audit it cannot afford on the one hand, or being required to countenance [compelled union representation of nonmembers without compensation] on the other." *Prescott* v. *County of El Dorado*, 915 F. Supp. 1080, 1090 n.15 (E.D. Cal. 1996). The Court of Appeals disagreed, stating:

> "We do not see how a mere review of the union's records can offer the 'verification' that the Supreme Court and we have spoken of. Audits are often required in business and public arenas, where others seek assurance that the reviewed books of an organization really do reflect the concrete world transactions to which they refer. It is just that kind of assurance that nonmembers are entitled to, even though it may prove somewhat costly to obtain it. As the Second Circuit has pointed out, it is not a question of balancing the cost to the union against the First Amendment rights of the fee payers. 'Excessive cost cannot form the basis for allowing the union or the government to avoid *Hudson*'s requirement that the procedures used by the union to allocate bargaining and administrative costs be carefully tailored to minimize the intrusion on nonmembers' rights.' *Andrews* [v. *Education Ass'n of Cheshire*, 829 F.2d 335, 339 (2d Cir. 1987)]. In short, a true audit was required."

*Prescott* v. *County of El Dorado, supra* at 1107-1108. Although the court in *Andrews* v. *Education Ass'n of Cheshire, supra* at 340 n.2, expressly declined to decide whether a small union's affairs could be so simple as to obviate the audit requirement, its reasoning adopted in *Prescott* v. *County of El Dorado, supra*, certainly suggests how these courts would resolve the conflict before us in the instant case.

Our own cases are in accord. In *Harrison* v. *Massachusetts Society of Professors/Faculty Staff Union*, 405 Mass. 56, 64 n.8 (1989), we stated quite unequivocally, *"Hudson* requires that the union's 'major categories of expenses' be listed 'as well as verification by an independent auditor.' *Chicago Teachers*

*Union, Local No. 1* v. *Hudson, supra* at 307 n.18.'' We said nothing to suggest that the Supreme Court's footnote is to be read narrowly, but rather suggested that the requirement applies, generally, to all union agency fee demands. Furthermore, in *Belhumeur* v. *Labor Relations Comm'n,* 411 Mass. 142, 145 (1991), cert. denied, 503 U.S. 1004 (1992), although we rejected the fee payers' reading of *Chicago Teachers,* we reaffirmed the requirement of audited verification of expenses, reasoning: "An audit of major categories of expenses should tend to assure nonmembers that the union indeed did incur the expenses on which the agency fee was based." We further pointed out that "[t]he information that *the union must provide* under the *Hudson* opinion is not intended to be dispositive of any dispute. That information is designed only to permit an agency fee payer to decide whether to oblige the union to prove before an independent fact finder that the agency fee charged was properly determined" (emphasis added). *Id.* at 146. Thus, because the unions now before us were also parties in *Belhumeur,* we have previously acknowledged that they remain within the ambit of the Supreme Court's requirement that the verification of major expenses by an independent auditor is a prerequisite to demanding agency fees under statutes such as G. L. c. 150E, § 12.

We see no basis for modifying the United States Supreme Court's express requirement that a union must accompany any demand for agency fees with an independently audited verification of its major expenses. *Chicago Teachers Union, Local No. 1* v. *Hudson, supra* at 307 n.18. Succinctly put, there is no exception to *Hudson*'s audit requirement for small local union affiliates.[8]

2. *Propriety of commission's remedy.* The unions next challenge the commission's remedial order compelling them to return the fees to the teachers absent an audit. They rely on a number of Federal cases for the proposition that such an order would result in a windfall to the teachers and deprive the unions of funds to which they are unquestionably entitled. See, e.g., *Weaver* v. *University of Cincinnati,* 970 F.2d 1523, 1533-1534

---

[8]In light of our conclusion that *Chicago Teachers Union, Local No. 1* v. *Hudson, supra* at 307 n.18, requires the unions to provide an independent audit in connection with a demand for agency fees, the unions' argument that the commission acted arbitrarily and capriciously when it declined to follow dicta from its decision in *Malden Educ. Ass'n,* 15 M.L.C. 1429, 1435 n.10 (1989), is without merit.

(6th Cir. 1992), cert. denied, 507 U.S. 917 (1993); *Lowary* v. *Lexington Local Bd. of Educ.*, 903 F.2d 422, 432-433 (6th Cir.), cert. denied, 498 U.S. 958 (1990); *Hohe* v. *Casey*, 956 F.2d 399, 415-416 (3d Cir. 1992); *Gilpin* v. *American Fed'n of State, County & Mun. Employees*, 875 F.2d 1310, 1313-1316 (7th Cir.), cert. denied, 493 U.S. 917 (1989); *Laramie* v. *County of Santa Clara*, 784 F. Supp. 1492, 1501-1502 (N.D. Cal. 1992). This reliance is misplaced. The unions refer only to cases in which the courts rejected dissenting nonmembers' claims to be excused from having to pay the agency fees even if a properly audited verification is supplied. As we interpret the commission's order, however, the unions are free to renew their demands for any fees to which they may be entitled once they comply with the requirements of *Chicago Teachers Union, Local No. 1.* v. *Hudson, supra.* See *Weaver* v. *University of Cincinnati, supra* at 1534 (rejecting plaintiffs' argument that denying full restitution would encourage unions to disregard *Hudson's* reasoning that "by granting a preliminary injunction barring continuation of fee collecting when a defective notice has been sent, the courts have a quick and efficient remedy for such a *Hudson* violation"); *Laramie* v. *County of Santa Clara, supra* at 1500 (permanently enjoining defendants from "taking any action to withhold fair-share fees from plaintiffs' salaries until defendants establish and implement adequate procedural safeguards as described in *Hudson*" and its progeny).

Because it was proper in all respects, we affirm the commission's decision.

*So ordered.*

Justice Fried participated in the deliberation on this case, but resigned before the opinion was issued.