Robert G. **BROMLEY, Philip L. Kintzele, Karl R. Lindfors, Frederick M. Phelps III, Ken W. Smith, John B. Mitchell, J. Carroll Arnett, Ella M. Gregoricka, Thomas B. Reed, Thomas E. Fahlstrom, Terry L. Apps, Sandra L. Conroy, Charlene L. Merrill, Vicky L. Niewoonder, Sally J. Redinger, Gordon E. Thomas, James W. Trowbridge, and Shirley A. Twietmeyer, Plaintiffs,**

v.

**MICHIGAN EDUCATION ASSOCIATION—NEA, National Education Association, Central Michigan University Faculty Association, Ferris Faculty Association, Grosse Pointe Education Association, Grosse Pointe Association of Educational Office Personnel, Lansing Schools Education Association, Mendon Education Association, and Traverse City Education Association, Defendants.**

No. 92–CV–10443–BC.

United States District Court, E.D. Michigan, N.D.

Jan. 11, 1994.

trial order shall not constitute a vehicle for add-

ing ... defenses.").

See also 815 F.Supp. 220.

Raymond J. LaJeunesse, Jr., Milton L. Chappell, National Right to Work Legal Defense Foundation, Inc., Springfield, VA and Reynolds H. Campbell, Kerr & Campbell, Mt. Pleasant, MI, for plaintiffs.

Arthur R. Przybylowicz and James J. Chiodini, White, Beekman, Przybylowicz Schneider & Baird, Okemos, MI, for defendants.

### *MEMORANDUM OPINION*

CHURCHILL, District Judge.

In this action eighteen public college and public school employees, who are not members of the union which is their collective bargaining unit representative, allege that the union is attempting to collect service fees for the 1991–92 school year for constitutionally nonchargeable purposes.

The plaintiffs seek a declaratory judgment, injunctive relief, damages and attorney fees. They also seek class certification on behalf of all public employees who are required to pay a service fee to the union and who have challenged or will challenge the amount of the fee for 1991–92 and/or subsequent school years.[1] The plaintiffs assert violation of rights protected by the First and Fourteenth Amendments to the Constitution of the United States. They seek relief pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988. Jurisdiction is invoked pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

Robert G. Bromley and six other plaintiffs were employed during the 1991–92 school year as faculty members of Central Michigan University, a state university located in Mt. Pleasant, Michigan. Each of the other eleven plaintiffs was employed, during the same school year, as teachers by the boards of education of one of several public schools throughout the State of Michigan.

Each of the plaintiffs was employed in a collective bargaining unit whose employees were represented, for collective bargaining purposes, by local affiliates of the Michigan Education Association (MEA) and the National Education Association (NEA). Under the union organizational structure, membership in a local affiliate constitutes membership in the state and national organizations. Members are required to pay dues to all three levels of the organization.

Pursuant to the collective bargaining agreements governing the plaintiffs' terms of employment, each of the plaintiffs is required to pay a service fee, a part of which is distributed to each level of the union organization.

This service fee requirement is authorized pursuant to Mich.Comp.Laws § 423.210. The Michigan service fee statute was specifically approved in *Abood v. Detroit Board of Education*, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977).

---

**1.** The service fee for the school year 1991–92 is based upon activities and expenditures in the prior fiscal year.

In *Chicago Teachers Union v. Hudson*, 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986), the Supreme Court established the foundation for a procedure for the determination of collective bargaining service fees by employees who are not members of the union. The Court stated:

> We hold today that the constitutional requirements for the Union's collection of agency fees include an adequate explanation of the basis for the fee, a reasonably prompt opportunity to challenge the amount of the fee before an impartial decisionmaker, and an escrow for the amounts reasonably in dispute while such challenges are pending.

*Hudson*, 475 U.S. at 310, 106 S.Ct. at 1077.

The MEA developed procedures which comply with *Hudson*. *Lehnert v. Ferris Faculty Association–MEA–NEA*, 707 F.Supp. 1490 (W.D.Mich.); *aff'd*, 893 F.2d 111 (6th Cir.1989), *cert. denied sub nom.*, *Lindsey v. Ferris Faculty Ass'n*, 496 U.S. 905, 110 S.Ct. 2586, 110 L.Ed.2d 267 (1990). The procedures followed by the union in this case were identical to those which have been judicially approved.

The union made an initial determination of the service fees to be charged to employees who did not pay union dues. The union sent a packet of information to each such employee. The packet of information contained a form which an employee could complete and return to challenge the tentatively established service fee. For the school year 1991–92, among all of its collective bargaining units, 236 employees, including the 18 plaintiffs, notified the union that they wished to challenge the 1991–92 service fee by checking the appropriate box on the objection form and by returning it to the union.

This action by the plaintiffs and others triggered the arbitration process.

Pursuant to its own Rules for Impartial Determination of Union Fees, the American Arbitration Association (AAA) appointed Arbitrator Barry C. Brown to arbitrate the dispute.

The fees that the defendants endeavor to collect are those which were determined to be appropriate in an Arbitration Opinion and Award issued by Arbitrator Barry C. Brown on April 16, 1992, following a three-day hearing in March, 1992. This suit was commenced October 6, 1992.

The Court has under advisement following oral argument, the defendants' motion for summary judgment.

The defendants' motion for summary judgment is based upon the findings and award of the arbitrator.

The issues that were briefed and argued on the defendants' motion for summary judgment fall into four categories:

1. The impact of *Hudson*-type arbitration on the scope of discovery in a subsequent action pursuant to 42 U.S.C. § 1983.

2. The impact of *Hudson*-type arbitration on the manner in which factual issues are defined and resolved in a subsequent § 1983 action.

3. The chargeability of specified categories of expenses.

4. The appropriateness of accounting procedures approved by the arbitrator.

### I.

■ The necessity to determine the impact of *Hudson*-type arbitration arises in this case, in the first instance, in the context of the scope of discovery.

The plaintiffs' first set of interrogatories asked the defendants to (a) identify the persons who participated in the defendants' calculations, and their auditors' examinations, of defendants' schedules of chargeable and nonchargeable expenditures on which the service fees for 1991–92 were based; and (b) to state the amounts which the defendants spent on each of the categories of chargeable and nonchargeable activities used by the defendants in making those calculations. The requests for production of documents asked the defendants to produce the record in the AAA proceeding; other documents underlying, used in, created during, or otherwise related to the defendants' calculations, and their auditors' examinations, of the schedules of chargeable and nonchargeable expenditures on which the fees for 1991–92 were based;

and the objection forms submitted by non-members who challenged those fees.

The defendants provided the plaintiffs with the record in the arbitration proceeding and the objection forms submitted by the non-members who challenged fees.

The defendants sought a protective order against further discovery. The plaintiffs sought a stay of the defendants' motion for summary judgment pending completion of discovery.

It was apparent to the Court that the arguments concerning these motions transcended normal discovery issues and raised issues of substantial significance. It was the opinion of the Court that the discovery issue could best be dealt with in the context of the defendants' motion for summary judgment. The Court conditionally granted the stay and required the plaintiffs to respond to the defendants' motion for summary judgment without further discovery. The Court did not, however, limit the evidence which plaintiffs could submit in support of their response to the defendants' motion for summary judgment.

■ The defendants have the burden of proof with respect to chargeability. The defendants collectively are a large and complex organization. Their financial affairs are complex. But for the arbitration proceedings and award, extensive discovery would be fully justified. The focus of the discovery issue has been on the impact of arbitration.

The plaintiffs' position is unequivocal. Relying on the *Gardner–Denver*[2] and *Mc-Donald*[3] line of cases[4] and on the statement in *Hudson* that an arbitrator's decision would not receive preclusive effect in any subsequent Section 1983 action, the plaintiffs' position is that they are entitled to proceed through pretrial proceedings including dis-

covery as though the arbitration proceedings had never taken place.

The defendants offer two arguments for limiting discovery.

First, the defendants assert that, in light of the arbitration proceedings, the Court should determine that the plaintiffs' discovery requests are unduly burdensome or expensive, taking into account the needs of the case, the amount in controversy, limitations on the parties' resources, and the importance of issues at stake in the litigation, and that the Court should limit discovery pursuant to Fed.R.Civ.P. 26(b)(1).

Second, the defendants assert that the discovery sought by the plaintiffs is not relevant and material to the issues before the Court. This argument is complex.[5] The defendants' position can best be explained by quoting directly from their brief in support of their motion for protective order.

The Sixth Circuit has emphasized that arbitration is the "legitimate first step in the *Hudson* sequence of proceedings." *Weaver [v. University of Cincinnati],* 970 F.2d [1523], 1536 [ (6th Cir.1992) *cert. denied sub nom., Weaver v. Steger,* — U.S. —, 113 S.Ct. 1274, 122 L.Ed.2d 668 (1993) ]. Arbitrators' decisions regarding the constitutionality of charging various expenses to nonmembers "are then *subject to review* by a court at the parties' request." *Id.* at 1536 (emphasis added). While the arbitrator's decision does not have preclusive effect (*Hudson,* 475 U.S. at 308, n. 21 [106 S.Ct. at 1077, n. 21] ), "an arbitrator's decision on the propriety of the chargeability definitions and calculations may be given deferential treatment by a district Court" (*Weaver [v. University of Cincinnati],* 764 F.Supp. [1241], 1246 [ (S.D.Ohio 1991) ] ) and be entitled to "great weight." *Lowary v. Lexington Local Board of Education,* 903 F.2d 422, 433, n. 3 [ (6th Cir.); *cert.*

---

**2.** *Alexander v. Gardner–Denver Company,* 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974).

**3.** *McDonald v. City of West Branch,* 466 U.S. 284, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984).

**4.** *See also Barrentine v. Arkansas–Best Freight System, Inc.,* 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981).

**5.** If their argument is ambivalent, it is because the courts themselves have been ambivalent in explaining the impact of *Hudson*-type arbitration awards and proceedings upon subsequent law suits.

*denied sub nom., Lowary v. Lexington Teachers Ass'n.,* 498 U.S. 958, 111 S.Ct. 385, 112 L.Ed.2d 396 (1990) ]. *Weaver* made it clear a district court may, *without an evidentiary hearing* (764 F.Supp. at 1246), "examine and ultimately ratify determinations made by a properly selected arbitrator upon a finding that an arbitrator's decision was correct." 970 F.2d at 1536. And the Supreme Court and Sixth Circuit have cautioned district courts against becoming involved in the "factual inquiries involved in making a chargeability determination." *Lowary,* 903 F.2d at 433, citing [*Brotherhood of R. & S.S. Clerks, etc. v.*] *Allen,* 373 U.S. [113], 123–24 [83 S.Ct. 1158, 1164–65, 10 L.Ed.2d 235], [ (1963) ]; *Abood,* 431 U.S. at 240[, 97 S.Ct. at 1802]; *Tierney v. City of Toledo,* 824 F.2d 1497, 1504–05 (6th Cir.1987). *Weaver* reaffirmed this proscription. 970 F.2d at 1535–36. ("Courts should *not* involve themselves in the factual inquiries involved in making a chargeability determination") (emphasis added).

Under the procedural and substantive framework thus established, the court's role in reviewing service fee arbitration awards is to review the union's definition of chargeable activities. Whether a union's definition of chargeable activities is in accordance with applicable law is a legal question for the Court.... If the Court determines the union's definitions are constitutionally appropriate, it may and should defer to the factual findings of the arbitrator. This approach is in keeping with precedent and recognizes the procedural and substantive framework balancing the important rights of all the participants in the service fee process, as well as the resources of the federal judiciary.

Defendants Brief in Support of Motion for Protective Order, 8–9.

The parties each seek from the Court a comprehensive rule. What they have a right to expect in the District Court is a clear and reasoned rule which applies in the circumstances of this case. The significant circumstances of this case are as follows:

1. Each of the plaintiffs did elect to challenge the union's chargeability determination by filing a form which initiated arbitration.[6]

2. The arbitration proceedings were conducted in full compliance with the Rules for Impartial Determination of Union Fees.

3. The record of proceedings does not disclose that there were significant conflicts of evidence with respect to material facts.

4. Although some of the plaintiffs did attend the hearings, none of the plaintiffs asked the arbitrator to require the unions to submit additional evidence or documents.

5. This suit was commenced after the issuance of the arbitration award.

6. The issue in the suit involves computation of the amount of fees which are chargeable.[7]

In *McDonald,* the Supreme Court summarized reasons for not giving *res judicata* or collateral effect to the arbitrator's decisions in *Gardner–Denver, Barrentine* and *McDonald.* Congress intended the statutes at issue in those cases to be judicially enforceable. Arbitration could not provide an adequate substitute for judicial proceedings under 42 U.S.C. § 1983. The reasons for this conclusion were explained. The arbitrator's expertise pertains to the law of the shop, not the law of the land. The arbitrator's authority to provide relief derives from contract, not from public law. The employee's presentation in arbitration is controlled by the union, not by the employee. Arbitral fact-finding is generally not equivalent to judicial fact-finding because " '[t]he record of arbitration proceedings is not as complete; the usual rules of evidence do not apply; the rights and procedures common to civil trial, such as discovery, compulsory process, cross-examination, and testimony under oath are often severely limited or unavailable.' " *Mc-*

---

**6.** In the Court's view, this circumstance and the fact that the suit was commenced after the issuance of the arbitration award should not be significant circumstances. The "exhaustion" issue, however, is not within the scope of this opinion.

**7.** According to the plaintiffs' attorney at oral argument, and this contention was not challenged by the defendants' attorney, this is the first case since *Hudson* that involves this issue.

*Donald,* 466 U.S. at 291, 104 S.Ct. at 1803, *quoting Gardner–Denver,* 415 U.S. at 57–58, 94 S.Ct. at 1024–25.

Arbitration pursuant to the Rules for Impartial Determination of Union Fees is significantly different from the contractual arbitration described in *McDonald.* *Hudson*-type arbitration includes the following characteristics:

1) The arbitrator's expertise includes the public law which has been judicially developed to determine chargeability;

2) The arbitrator's authority can be directly traced back to the Supreme Court mandate in *Hudson;* and

3) The employee controls his or her own presentation to the arbitrator.

The arbitral fact-finding in *Hudson*-type arbitration is not equivalent to judicial fact-finding, but it is designed to be as close to judicial fact-finding as is possible in an arbitral setting. The rules place the burden upon the union to justify fees which are being disputed. The rules include the right to be represented by counsel, the right to have a stenographic record, the sequestration of witnesses, adjournments for cause, provision for requiring witnesses to testify under oath and the opportunity for each party to present evidence. Although there is no discovery per se, the rules specifically provide that the parties shall produce such additional evidence as the arbitrator may deem necessary to an understanding and determination of the dispute.

The rules are broad enough to enable a party to identify areas of factual dispute upon which chargeability turns and, for that matter, to seek a favorable resolution of identified factual issue by the arbitrator.

It is the opinion of the Court that under the circumstances of this case which are outlined above, the plaintiffs' shotgun-type interrogatories and requests for the production of documents were unduly burdensome within the meaning of Fed.R.Civ.P. 26(b)(1).

8. The plaintiffs do concede that in the Court's discretion, the findings of the arbitrator may be admissible in evidence.

The order to be entered will confirm the conditional ruling granting the defendants' motion for a protective order. The defendants' motion for summary judgment will be determined on the record before the Court.

## II.

■ As with respect to discovery, it is the plaintiffs' position that in the resolution of substantive issues, whether by summary judgment or trial, the proceedings leading to arbitration and the arbitration proceedings themselves can be virtually ignored.[8]

The defendants' position is that if the Court determines that the unions' definitions are constitutionally appropriate, the Court may and should defer to the factual findings of the arbitrator.

Although there is no definitive Supreme Court or Sixth Circuit precedent on this issue, the problem has been anticipated.

Unless the arbitration award is to have a significant impact in subsequent judicial proceedings, the procedure spawned by the Supreme Court is largely a waste of time and money.

The Sixth Circuit in *Lowary,* 903 F.2d at 433 and again in *Weaver,* 970 F.2d at 1535 expressed the view that "the Supreme Court has suggested that courts should not involve themselves in factual inquiries involved in making a chargeability determination." See the quotation from the defendants' brief on pages 7–8 of this opinion.

Diligent review by courts of the categories of activities deemed chargeable by unions is the most important step that courts may take to protect First Amendment values.

If auditors and arbitrators perform their roles in an adequate manner, the risks of burdening free speech is further diminished. The AAA's Rules for Impartial Determination of Union Fees are carefully crafted to accomplish this objective. More often than not, if relevant fact questions survive the arbitration process, relatively little money

will depend upon their resolution in subsequent litigation.[9]

For these reasons it is the opinion of the Court that it is desirable and consistent with developing case law to give as much deference to the arbitration award as is consistent with the mandate of § 1983.

Substantively, the issue to be determined in this suit is not, per se, the correct amount of the fee to be charged to the plaintiffs.

The legal issues to be decided involve the constitutionality of the unions' definitions of categories of chargeable activities and expenditures.

The factual issue to be decided, in the first instance at least, is whether the computations were made in a reasonable manner.

It is the opinion of the Court that it is not inconsistent with § 1983 to give great deference to the arbitrator's approval of accounting procedures followed by the unions in making their computations, especially when, as here, no evidence challenging the accounting procedures was offered at the arbitration proceeding.

Likewise, in the opinion of the Court, it is not inconsistent with § 1983 in ruling on a motion for summary judgment to give great deference to the fact-findings made by the arbitrator especially when, as here, no evidence inconsistent with the fact findings was offered at the arbitration proceedings.

### III.

In their response to the defendants' motion for summary judgment the plaintiffs challenge the chargeability of expenses in four specific categories:

(1) Expenses incurred in connection with extra-unit litigation.

(2) Expenses for activities taken to protect and strengthen existing bargaining units.

(3) NEA expenditures for the National Foundation for the Improvement of Education.

(4) Certain administrative expenses.

**9.** If there are factual issues to be resolved, it might be appropriate to refer them to the arbitra-

 The Supreme Court in *Lehnert v. Ferris Faculty Ass'n.,* 500 U.S. 507, ——, 111 S.Ct. 1950, 1959, 114 L.Ed.2d 572, 589 (1991), ruled that the following guidelines are to be followed in making such determinations:

(1) such activities must be germane to collective-bargaining activity,

(2) charging such activities to dissenters must be justified by the government's vital policy interest in labor peace and avoiding "free riders," and

(3) charging such activities to dissenters must not significantly add to the burdening of free speech that is inherent in the allowance of an agency or union shop.

### A.

In *Lehnert v. Ferris Faculty Ass'n–MEA–NEA,* 643 F.Supp. 1306 (W.D.Mich.1986), Judge Enslen, at 1325, ruled that litigation expenses were constitutionally chargeable regardless of whether the litigation involved members of service fee payer's bargaining unit if the litigation was related to the unit's duties as exclusive bargaining representative. The district court's decision was affirmed on appeal. *Lehnert v. Ferris Faculty Ass'n.,* 881 F.2d 1388 (6th Cir.1989). The circuit court opinion contains no specific reference to the extra unit litigation issue. The Supreme Court affirmed in part and reversed in part. *Lehnert,* 500 U.S. 507, 111 S.Ct. 1950, 114 L.Ed.2d 572 (1991).

Justice Blackmun, writing for himself and four other justices including Justice Marshall, stated the general rule that a local bargaining representative may charge objecting employees for their *pro rata* share of the costs associated with otherwise chargeable activities of its state and national affiliate, even if those activities were not performed for the direct benefit of the objecting employees' bargaining unit. *Id.,* 500 U.S. at ——, 111 S.Ct. at 1963, 114 L.Ed.2d at 595. Justice Blackmun, however, recognized an exception that the general rule does not extend to the expenses of litigation that do not

tor as a special master.

concern the dissenting employees' bargaining unit. In an opinion concurring in part and dissenting in part, Justice Marshall stated that Justice Blackmun's opinion concerning extra unit litigation was no more than dicta. At the same time he made it clear that he would treat such costs as chargeable.

Three other justices concurred in whole or in part with an opinion authored by Justice Scalia. In one respect, Justice Scalia's opinion is not ambiguous. Justice Scalia rejected the Blackmun three-part test and would have allowed unions to compel contributions for dissenting employees only for the costs of performing the union's statutory duties as exclusive agent for a bargaining unit. It cannot be discerned with any degree of confidence how he and the justices who joined with him decided the extra-unit litigation cost issue, if indeed they did.

The Court agrees with Justice Heffernan, Chief Judge of the Wisconsin Supreme Court, who concluded that Justice Scalia did not directly address the issue and that there is no majority holding on this issue in *Lehnert. Browne v. Wisconsin Employment Relations Commission,* 169 Wis.2d 79, 485 N.W.2d 376, 388 (1992).

One aspect of Justice Scalia's opinion is not ambiguous. Justice Scalia rejected the majority's three-part test and would have allowed unions to compel contributions from dissenting employees only for the costs of performing the union's statutory duties as exclusive bargaining agent.

The Court presumes that if the Supreme Court has occasion to revisit the issue, the entire Court will follow the majority opinion in applying the three-part test rather than the minority statutory test. It is mere speculation how the extra-unit litigation issue might be resolved by a majority of the Supreme Court applying the guidelines that are set forth in the majority opinion. To the extent that it was not reversed by the Supreme Court, the Sixth Circuit's opinion was affirmed.

The Court is bound by the Sixth Circuit opinion affirming Judge Enslen's opinion on this issue.

## B.

■ The defendants classify as chargeable activities taken to protect and strengthen existing bargaining units, including actions relating to decertification petitions, unit clarifications and accretions.

The plaintiffs refer to these activities as "defensive organizing." This is a misnomer. The expenditures claimed do not include expenditures for recruiting new members or for organizing new bargaining units.

In *Lehnert,* 500 U.S. at ——, 111 S.Ct. at 1961, 114 L.Ed.2d at 592, the Court, quoting *Ellis v. Brotherhood of Railway Clerks* [10], stated that if a union is performing its statutory functions it must maintain its corporate or associational existence and must carry on its own affairs.

The identified activities are essential to the unions' ability to bargain collectively for the benefit of all represented employees and clearly satisfy the first two parts of the three-part test articulated by Justice Blackmun in *Lehnert.* To the extent that a member of the bargaining unit may be ideologically opposed to the concept of collective bargaining in a closed or union shop, there is some burden in this kind of activity upon First Amendment values. On balance, it is the opinion of the Court that charging the dissenters with these activities will not significantly add to that burden.

## C.

The defendants do not challenge the plaintiffs' allegation in their brief in opposition to the defendants' motion for summary judgment that "[t]he NEA considered its expenditures of $2,300,000 for the National Foundation for the Improvement of Education ("NFIE") as entirely chargeable."

The plaintiffs have submitted a document that reveals that during the year 1993 the NFIE administered two grant programs, the William G. Carr Grant Program which was established in 1967 and the Hilda Mehling Grant Program which was established in 1959. It appears to be undisputed that the NFIE is self-funded. It may be inferred that the funds for Carr grants are derived from dues. It may also be inferred that the NFIE has administered these grant pro-

---

**10.** 466 U.S. 435, 448, 104 S.Ct. 1883, 1892, 80 L.Ed.2d 428 (1984).

grams and made awards from them in prior years. The Carr grants are up to $2,500 each. There is no evidence from which it can be inferred that either grant program made grants in any one fiscal year.

The document submitted by the plaintiffs provides that, with respect to both kinds of grants, "Only members of the National Education Association and educators from other countries, who are members of the WCOTP-affiliated educational organizations are eligible to apply." [11]

 Clearly, as a matter of law, members-only benefits are not chargeable. It is the opinion of the Court that neither funds for grants for which nonmembers are not eligible nor expenditures for administering such grants are chargeable. The evidence, however, does not support a conclusion that if an appropriate part of the NFIE expenditure for the relevant school year was determined not to be chargeable, that the service fee each of the plaintiffs is required to pay would be reduced by a significant amount.

In any event, this is a matter that could easily have been corrected by the arbitrator had someone brought the problem to his attention. The arbitrator could have required the union to provide data on the issue for the relevant school year and would likely have resolved the issue to the plaintiffs' satisfaction. This is a good example of the wisdom of the rule that courts may and should defer to the findings of the arbitrator.

### D.

 As a general rule the unions allocate a portion of administrative and overhead expenses as nonchargeable expenses. The plaintiffs challenge as illegal the fact that some administrative expenses which are referred to as expenditures incurred to ensure the satisfactory operation of the union's organization including administrative activities and expenditures for the operation of the organization are treated as fully chargeable. Specifically, the plaintiffs object to the fact that time spent by salaried officers and staff personnel dealing with staff problems, reviewing mail and paying bills and the like, as well as the entire cost of liability insurance premiums, fidelity bond premiums and build-

ing renovation (asbestos removal) were treated as fully chargeable. The arbitrator approved the allocation. It is not unreasonable to treat the challenged expenses as having been incurred to maintain the union's existence and to carry on its affairs.

### IV.

 On November 2, 1993, the day before oral argument was scheduled, the plaintiffs filed a supplemental affidavit challenging the manner in which UniServ grants and Unified Legal Services Program (ULSP) reimbursements were allocated. On November 22, 1993, with the Court's permission, the defendants filed a supplemental reply brief.

These grants and reimbursements involve disbursements from the NEA to the state affiliates including the MEA. Accounting procedures involved in the allocations were modified for the 1991–92 school year.

The chargeability of most expenses incurred by the NEA is determinable through the NEA's records. The chargeability of Uniserv and ULSP disbursements must be determined by how the state affiliates use the grant money.

Beginning in 1991–92, the NEA began to use only the specific state's chargeable percentages for the Uniserv and ULSP grants to determine the agency fee it charged objecting fee payers in that state. For audit reporting purposes, the NEA uses adjustments of the average chargeable percentages of Uniserv grants and ULSP reimbursements from the previous fiscal year because the NEA audit is performed before all state affiliates have completed their chargeable allocations for the fiscal year. At each state's arbitration, the current figures for that state are used.

As a matter of law, this is a reasonable procedure.

 The plaintiffs complain about the accounting procedures used in making allocations in other respects. However, " '[a]bsolute precision in the calculation [of the fee] is not ... to be expected or required; we are mindful of the difficult accounting problems that may arise.' " *Abood v. Detroit Board of Education,* 431 U.S. at 239 n. 40, 97 S.Ct. at

---

**11.** WCOTP stands for World Confederation of
Organizations of the Teaching Profession.

1801 n. 40, *quoting Allen,* 373 U.S. at 122, 83 S.Ct. at 1163. The attacks by the plaintiffs upon the accounting procedures used by the defendants do not create a genuine issue of material fact for trial.

### Conclusion

In drawing the conclusion that the record does not disclose the existence of genuine issues of material fact, the Court has granted some deference to the award of the arbitrator. Had some of the issues raised by the defendants been brought to the arbitrator's attention, it is not unlikely that the arbitrator would have required the unions to provide some additional records. It is possible that he would have modified the unions' calculations in some respects. In all probability, the adjustment would have been minimal.[12]

An order will be entered granting the defendants' motion for summary judgment. The plaintiffs' motion for class certification is moot.

In due course, a judgment for the defendants will be entered. Because of the nature of the proceedings, no costs shall be allowed.

---

**12.** The MEA service fee reflects a $2.00 deduction to make allowance for potential disputes.