Robert G. BROMLEY, et al.,
Plaintiffs–Appellants,

v.

MICHIGAN EDUCATION ASSO-
CIATION–NEA, et al., De-
fendants–Appellees.

Nos. 94–1164, 94–1210.

United States Court of Appeals,
Sixth Circuit.

Argued May 5, 1995.

Decided April 26, 1996.

Rehearing and Suggestion for Rehearing
En Banc Denied June 17, 1996.

Raymond J. LaJeunesse, Jr. (argued and briefed), Nat. Right to Work Legal Defense Foundation, Springfield, VA, Reynolds H Campbell, Kerr & Campbell, Mt. Pleasant, MI, for Plaintiffs-Appellants.

Robert H. Chanin (briefed), John M. West (argued), Bredhoff & Kaiser, Washington, DC, Arthur R. Przybylowicz, James J. Chiodini, White, Przybylowicz, Schneider & Baird, Okemos, MI, for Defendants-Appellees.

Before: NELSON and DAUGHTREY, Circuit Judges, and HILLMAN, District Judge.*

DAVID A. NELSON, Circuit Judge.

The plaintiffs in this lawsuit are public employees whose wages, hours, and other conditions of employment are established through collective bargaining between the bodies by which they are employed and local unions affiliated with the Michigan Education Association. The plaintiffs are not union members. Under agency shop contracts authorized by state law, however, the plaintiffs are required to pay agency fees, or "service fees," that are divided among local, state and national unions involved in the bargaining process.

Alleging that the amount collected by the unions in 1991–92 exceeded constitutional limits, part of the fees having been based on expenditures for political, ideological, and other activities not demonstrably germane to collective bargaining, the plaintiffs sued for declaratory, injunctive and monetary relief under 42 U.S.C. § 1983. The stated purpose of the action was to vindicate the plaintiffs' First Amendment rights to freedom of speech, association, petition, belief and thought.

The plaintiffs served timely discovery requests in which they sought, among other things, identification of the people who had calculated the service fees and production of documents underlying the calculations. Discovery was stayed after the unions complied with a portion of the document request relating to the record of a service fee arbitration that had been conducted at the unions' request (and in which one of the plaintiffs had participated) pursuant to *Chicago Teachers Union v. Hudson*, 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986). (*Hudson* holds that while the decision rendered by the arbitrator in such a proceeding cannot be given preclusive effect in a subsequent § 1983 action, a union's collection of an agency fee is permissible if the union provides (1) an explanation of the basis of the fee, (2) an opportunity to challenge the fee before an impartial decisionmaker, and (3) an escrow for amounts reasonably in dispute. The plaintiffs do not deny that the unions met these conditions here.)

After unsuccessfully seeking dismissal of the § 1983 action on statute of limitations grounds, the unions moved for summary judgment on the strength of the arbitrator's decision—a decision in which the exaction of service fees in the amounts set by the unions was held not to violate the First Amendment. Although the arbitrator had not seen the documents underlying the unions' calculation of the service fees, the unions maintained that the arbitral award was entitled to great weight in the § 1983 case even without discovery of the underlying documents.

The stay of discovery was continued during the pendency of the summary judgment proceedings, despite representations by the plaintiffs that discovery was essential to their opposition to summary judgment. The court ultimately entered summary judgment in favor of the unions without any of the plaintiffs having been furnished access to the documents in question. The decision is reported as *Bromley v. Michigan Educ. Ass'n*, 843 F.Supp. 1147 (E.D.Mich.1994).

The central question presented on appeal is whether the court's curtailment of discovery constituted an abuse of discretion. We conclude that it did. Accordingly, and be-

---

* The Honorable Douglas W. Hillman, United States District Judge for the Western District of Michigan, sitting by designation.

cause we find merit in some, but not all, of the plaintiffs' subsidiary points, we shall vacate the judgment and remand the case for further proceedings.

## I

Filed as a class action, the § 1983 case was brought by seven members of the faculty of Central Michigan University together with ten public school teachers and one public school "educational support" person. The defendants are the Michigan Education Association, seven of its local affiliates, and the Association's parent body, the National Education Association.

Each of the named plaintiffs works in a bargaining unit all of the members of which—whether or not they have chosen to join a labor union—are represented for collective bargaining purposes by one or another of the defendant unions. See Mich. Comp. Laws 423.211, under which a representative selected by the majority of public employees in a bargaining unit is made the exclusive representative of all employees in the unit.

Pursuant to Mich. Comp. Laws 423.210, the plaintiffs' employers have entered into collective bargaining agreements requiring the plaintiffs and all other non-union bargaining unit employees to pay service fees to the bargaining representatives. Each academic year the unions set the fees (which may not exceed the dues paid by union members) on the basis of "chargeable" costs incurred the year before. The money goes to the local, state and national organizations in proportion to their past expenditures on chargeable activities.

In December of 1991, pursuant to procedures established by it in light of the *Hudson* decision, the Michigan Education Association sent each non-union bargaining unit employee a packet of materials relating to the collection of service fees. Included in the packet was a statement to the effect that individuals who objected to contributing to the financial support of ideological causes or political activities unrelated to collective bargaining would be required to pay reduced fees determined by the Association on the basis of the prior school year's representa-

tion expenditures. The packet also included an explanation of the fee calculations, audited union financial statements, a description of a procedure for challenging the fees, and a "service fee election form."

Some 236 non-union employees sent back service fee election forms on which they indicated that they wished to challenge the fees. The first named plaintiff, Robert Bromley, stated on his form that he would pay the reduced Association-determined fees (which totaled $379.20 in his case) "under protest." In addition to checking boxes signifying that he wished to challenge the state, local and national fees pursuant to the procedure described in the packet, Mr. Bromley, like several other named plaintiffs, added the following statement to his form:

"Paid under protest. I have instructed my attorneys to pursue legal action challenging both the collection procedures, as applied, and the amount of the fee itself. I do not hereby waive my rights to challenge the amount of the fee in forums in addition to that provided under those procedures."

Upon receipt of the forms, the Association initiated a consolidated arbitration proceeding under rules issued by the American Arbitration Association after *Hudson* was decided. The rules (entitled "Rules for Impartial Determination of Union Fees") provide that the American Arbitration Association shall appoint an impartial arbitrator at the instance of the union. The union compensates the arbitrator and pays the American Arbitration Association a fee as well. The arbitrator is to be "experienced in employment relations," according to the rules, and is to render a prompt decision "in accordance with applicable law and the union's internal procedures...." Prospective arbitrators are subject to challenge for cause, but the rules contain no provision for peremptory challenges.

Neither do the rules provide for pre-hearing discovery. Rule 14 does say, however, that "[t]he parties may offer such evidence as they desire and shall produce such additional evidence as the arbitrator may deem necessary to an understanding and determination of the dispute." Conformity to the rules of evidence is not necessary, but the arbitrator

may require that witnesses give their testimony under oath.

The arbitrator who was appointed in this instance, a Mr. Barry C. Brown, conducted hearings on March 18, 19 and 23, 1992. Counsel for the unions were present, along with various union employees and a certified public accountant engaged by the unions. Three individual "objectors and observers" appeared, only one of whom—Thomas Reed—was to become a named plaintiff in the present § 1983 action. None of the three objectors was accompanied by a lawyer, although the rules permitted representation by counsel or others.[1]

■ In consonance with a line of Supreme Court caselaw that includes *Railway Clerks v. Allen*, 373 U.S. 113, 83 S.Ct. 1158, 10 L.Ed.2d 235 (1963), *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977), and *Hudson*, the Arbitration Association rules state that "[t]he burden is upon the union to justify whatever fees are being disputed."[2] In the proceeding before Mr. Brown, the unions sought to discharge their burden through a comprehensive overview of the unions' cost structure presented by witnesses whose testimony was accompanied by a series of summary exhibits. One of the witnesses testified that outside auditors were given full exposure to all documentation used in determining the fees, but none of the three objectors asked Mr. Brown to require production of the underlying documentation as "additional evidence" under Rule 14. We do not know how Mr. Brown would have responded to such a request.

The objectors posed some questions to the union's witnesses and "made their views known to the arbitrator," as Mr. Brown put it in his decision. Post-hearing briefs were filed by the state and national unions, but none of the objectors filed a brief.

Mr. Brown issued his decision approving the union's fees on April 16, 1992. The plaintiffs brought their § 1983 action the following October.

The defendant unions promptly raised their statute of limitations defense in a motion for judgment on the pleadings. While that motion was pending, the plaintiffs served the defendants with interrogatories asking for (a) identification of the people who had participated in preparing and auditing the schedules of expenditures on which the service fees were based, and (b) a statement of the dollar amount of each category of expenditures. The plaintiffs also served a document production request covering (a) the arbitration record, (b) the election forms returned by non-members who challenged the service fees, and (c) "documents underlying, used in, created during, or otherwise related to defendants' calculations, and their auditors' examinations, of defendants' schedule of chargeable and nonchargeable expenditures on which the service fees for 1991–92 were based...."

The defendant unions gave the plaintiffs the arbitration record and the election forms, but declined to answer the remaining discovery requests. The unions sought a protective order blocking all other discovery.

In a series of orders issued before and after its denial of the motion for judgment on the pleadings, the district court declined to allow any further discovery. When the unions moved for summary judgment, the plaintiffs filed papers advising the court that there had been no showing of good cause for preventing discovery of non-privileged matters relevant to the subject matter of the case; that determination of the constitutionality of the unions' classification of expenses

---

1. A non-profit foundation that is providing counsel for the plaintiffs in the § 1983 case circulated a form letter in December of 1991 advising prospective challengers that the foundation lacked the resources to provide attorneys and accountants in the arbitration proceeding. The letter stated that arbitration was not likely to provide as much relief as a court suit. Seventeen of the 18 named plaintiffs chose not to participate in the arbitration proceeding.

2. "Since the unions possess the facts and records from which the proportion of political to total union expenditures can reasonably be calculated, basic considerations of fairness compel that they, not the individual employees, bear the burden of proving such proportion." *Allen*, 373 U.S. at 122, 83 S.Ct. at 1163, as quoted in *Abood*, 431 U.S. at 239–40 n. 40, 97 S.Ct. at 1802 n. 40, and *Hudson*, 475 U.S. at 306, 106 S.Ct. at 1075–76.

as chargeable to objecting non-members required "specific identification of the activities involved;" and that discovery of these facts— facts solely within the possession of the unions—was essential for opposition to the summary judgment motion. Pursuant to Rule 56(f), Fed.R.Civ.P., the plaintiffs moved to stay consideration of the summary judgment motion until completion of discovery.

The court denied the stay, commenting that the record of the arbitration gave the plaintiffs "everything they need to enable them to respond to the defendants' motion for summary judgment." This position was subsequently reaffirmed in the published opinion granting summary judgment.

"But for the arbitration proceedings and award," the district court acknowledged in its published opinion, "extensive discovery would be fully justified." *Bromley,* 843 F.Supp. at 1151. Because the plaintiffs had been accorded an opportunity to participate in the arbitration proceeding, however, the court found that the discovery requests at issue "were unduly burdensome within the meaning of Fed.R.Civ.P. 26(b)(1)." *Id.* at 1153. "Had some of the issues raised by the defendants [sic] been brought to the arbitrator's attention," the court said in conclusion, "it is not unlikely that the arbitrator would have required the unions to provide some additional records." *Id.* at 1157. But the arbitrator not having been asked to provide access to the underlying records, the court was unwilling to grant the plaintiffs access to them itself.

The plaintiffs have perfected a timely appeal from the final judgment in which the district court dismissed their complaint.

## II

■ "[T]o compel a man to furnish contributions of money for the propagation of opinions which he disbelieves, is sinful and tyrannical." Thus wrote Thomas Jefferson in a passage quoted in I. Brant, *James Madison: The Nationalist* 354 (1948), and repeated with approval by the Supreme Court in *Abood,* 431 U.S. at 234 n. 31, 97 S.Ct. at 1799 n. 31, and *Hudson,* 475 U.S. at 305 n. 15, 106 S.Ct. at 1075 n. 15.

■ Jefferson's thought is now part and parcel of our First Amendment jurisprudence. For the government to threaten men and women with the loss of their livelihoods if they fail to remit part of their earnings to labor unions for the advancement of social and political causes they do not wish to support is not only sinful and tyrannical, it is a violation of the United States Constitution. See *Abood,* 431 U.S. at 234, 97 S.Ct. at 1799; *Hudson,* 475 U.S. at 301–02, 106 S.Ct. at 1073–74.

To an extent, the Supreme Court has recognized, the very existence of an agency shop trenches upon the First Amendment interests of bargaining unit employees who oppose unions. See *Hudson,* 475 U.S. at 309, 106 S.Ct. at 1077 ("the agency shop itself impinges on the nonunion employees' First Amendment interests"), and *Lehnert v. Ferris Faculty Ass'n,* 500 U.S. 507, 519, 111 S.Ct. 1950, 1959, 114 L.Ed.2d 572 (1991), where the Court spoke of "the burdening of free speech that is inherent in the allowance of an agency or union shop." But in a constitutional compromise not atypical of the many such compromises that have been struck since the founding of the Republic, the Supreme Court has decided to let all bargaining unit employees be required to bear the cost of collective bargaining activities—thereby denying a "free ride" to non-union employees who might stand to benefit from such activities—while not allowing "compulsory subsidization of ideological activity by employees who object thereto. . . ." *Abood,* 431 U.S. at 237, 97 S.Ct. at 1800.

■ Courts must proceed case-by-case in determining which union expenditures are chargeable to dissenting employees and which are not. Such determinations are frequently difficult (particularly in the case of expenditures for activities that may not be overtly ideological but that bear only a peripheral relation to bargaining for the members of the unit), and the guidance provided by the Supreme Court is somewhat general in nature. See, for example, *Ellis v. Railway Clerks,* 466 U.S. 435, 448, 104 S.Ct. 1883, 1892, 80 L.Ed.2d 428 (1984):

"[T]he test must be whether the challenged expenditures are necessarily or reasonably incurred for the purpose of performing the duties of an exclusive representative of the employees in dealing with the employer on labor-management issues. Under this standard, objecting employees may be compelled to pay their fair share of not only the direct costs of negotiating and administering a collective-bargaining contract and of settling grievances and disputes, but also the expenses of activities or undertakings normally or reasonably employed to implement or effectuate the duties of the union as exclusive representative of the employees in the bargaining unit."

*Cf. Lehnert,* 500 U.S. at 519, 111 S.Ct. at 1959:

"[C]hargeable activities must (1) be 'germane' to collective-bargaining activity; (2) be justified by the government's vital policy interest in labor peace and avoiding 'free riders'; and (3) not significantly add to the burdening of free speech that is inherent in the allowance of an agency or union shop."

But wherever the line between the chargeable and the nonchargeable may be drawn in a particular case, the Supreme Court's decisions leave no room for doubt that there is a line somewhere beyond which the unions may not go without violating the Constitution.

To protect the constitutional rights of all citizens of the United States, 42 U.S.C. § 1983 recognizes a cause of action against any person who, acting under color of law, subjects another to the deprivation of rights secured by the Constitution. And the district courts established by Congress pursuant to Article III of the Constitution have been given original jurisdiction over civil actions brought to recover damages or to secure equitable or other relief under any Act of Congress, including § 1983, providing for the protection of civil rights. See 28 U.S.C. § 1343(a)(4).

■ The statutory right to have an Article III court adjudicate suits brought pursuant to § 1983 for vindication of rights secured by the First Amendment of the Constitution cannot be foreclosed by non-statutory arbitration conducted by a privately appointed decisionmaker. See *McDonald v. City of West Branch, Mich.,* 466 U.S. 284, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984), where a unanimous Supreme Court, speaking through Justice Brennan, so held in reversing a decision in which our own court had given *res judicata* effect to the decision of a private arbitrator appointed pursuant to a collective bargaining agreement. See also *Alexander v. Gardner–Denver, Co.,* 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), holding that an arbitral award entered pursuant to a collective bargaining agreement cannot foreclose a suit brought under Title VII of the Civil Rights Act of 1964.

The arbitration initiated by the defendant unions here was conducted under the procedure outlined by the Supreme Court in *Hudson,* of course, and not under a collective bargaining agreement. But *Hudson* did not purport to foreclose the remedy provided for in § 1983. Citing *McDonald,* on the contrary, the *Hudson* Court expressly recognized that "[t]he arbitrator's decision would *not* receive preclusive effect in any subsequent § 1983 action." *Hudson,* 475 U.S. at 308 n. 21, 106 S.Ct. at 1077 n. 21. (Emphasis supplied.) *Cf. McDonald,* 466 U.S. at 292, 104 S.Ct. at 1804: "courts should ever be mindful that Congress ... thought it necessary to provide a judicial forum for the ultimate resolution of [these] claims. It is the duty of the courts to assure the full availability of this forum." *Id.* at 292 n. 13, 104 S.Ct. at 1804 n. 13, quoting *Gardner–Denver,* 415 U.S. at 60 n. 21, 94 S.Ct. at 1025 n. 21.

■ This is not to say that, under appropriate circumstances, an arbitral decision may not be given considerable weight in the adjudication of § 1983 actions. The weight to be accorded such a decision depends, however, on the facts and circumstances of the particular case. Again quoting *Gardner–Denver, id.* at 60 n. 21, 94 S.Ct. at 1025 n. 21, *McDonald* says that among the factors relevant in this regard are these:

"the degree of procedural fairness in the arbitral forum, adequacy of the record with respect to the issue [in the judicial pro-

ceeding], and the special competence of particular arbitrators. Where an arbitral determination gives full consideration to an employee's [statutory or constitutional] rights, a court may properly accord it great weight. This is especially true where the issue is solely one of fact, specifically addressed by the parties and decided by the arbitrator on the basis of an adequate record." *McDonald*, 466 U.S. at 292 n. 13, 104 S.Ct. at 1804 n. 13.

Reviewing these factors in relation to the record before us in the case at bar, we are not persuaded that the district court was justified in accepting the arbitrator's endorsement of the unions' cost allocations without allowing discovery of the materials on which the calculations were based. Our thinking on this runs as follows.

■ " '[P]rocedural safeguards often have special bite in the First Amendment context.' G. Gunther, Cases and Materials on Constitutional Law 1373 (10th ed. 1980). * * * The purpose of these safeguards is to insure that the government treads with sensitivity in areas freighted with First Amendment concerns." *Hudson*, 475 U.S. at 303 n. 12, 106 S.Ct. at 1074 n. 12. Among the procedural safeguards available in a judicial forum are rules of evidence that treat hearsay with skepticism, and discovery procedures that allow litigants to probe their adversaries' cases in depth prior to hearing. These safeguards were much attenuated here.

The case presented to the arbitrator rested primarily on hearsay—upon summaries of documents that were not presented in evidence and had not been made available for inspection by dissenters prior to the arbitration hearing. It is true that the arbitrator had authority under the Arbitration Association rules to order the production of "such additional evidence" as he might have deemed necessary to his "understanding and determination of the dispute." But it would not be realistic, in our view, to expect the arbitrator to go through raw data at the hearing as thoroughly as litigants commonly go through such data in pre-hearing discovery. And like the rules of evidence, pre-hearing discovery has been dispensed with

under the rules that govern arbitrations such as this one.

Even if the arbitration rules had been a mirror image of the Federal Rules of Civil Procedure, moreover, they would not necessarily have insured the adequacy and reliability of the arbitral record in this particular case. The fact is that arbitrator Brown—a man who is experienced in labor relations, presumably, but who has not been shown to possess any special competence in First Amendment law—was not provided record information that had been vetted prior to the hearing in such a way as to inspire confidence that it could appropriately be used as the basis of a definitive determination of the objectors' First Amendment claims.

■ The absence of a record containing information that had been so vetted is by no means surprising. "[A]rbitral factfinding is generally not equivalent to judicial factfinding." *McDonald*, 466 U.S. at 291, 104 S.Ct. at 1803. "The record of the arbitration proceeding is not as complete; the usual rules of evidence do not apply; and *rights and procedures common to civil trials, such as discovery ... are often severely limited or unavailable.*" *Gardner–Denver*, 415 U.S. at 57–58, 94 S.Ct. at 1024. (Emphasis supplied.) Thus it is that in a § 1983 action, at least, "an arbitration proceeding cannot provide an adequate substitute for a judicial trial." *McDonald*, 466 U.S. at 292, 104 S.Ct. at 1804.

But if an arbitration proceeding is no substitute for a judicial trial, the district court concluded that the arbitral award ought to have a "significant impact in subsequent judicial proceedings...." *Bromley*, 843 F.Supp. at 1153. Otherwise, the court suggested, "the procedure spawned by the Supreme Court is largely a waste of time and money." *Id.*

■ If in practical terms the "impact" of an arbitral award on subsequent judicial proceedings is to be the denial of meaningful pre-trial discovery, we do not believe that the "waste of time and money," if any, can justify such a denial. The right to discovery is a safeguard which—to borrow the language of *Hudson* again—helps "insure that the gov-

ernment treads with sensitivity in areas freighted with First Amendment concerns." *Hudson*, 475 U.S. at 303 n. 12, 106 S.Ct. at 1074 n. 12.

It is far from self-evident, moreover, that *Hudson* arbitration would in fact become a waste of time and money unless its availability were held to foreclose normal pre-trial discovery. As the Supreme Court of California recently observed in rejecting a "waste of time" argument based on the district court's opinion in the case at bar, "the time is not wasted if it offers a potential for avoiding litigation." *Brosterhous v. State Bar of California*, 12 Cal.4th 315, 333, 48 Cal.Rptr.2d 87, 98, 906 P.2d 1242, 1253 (1995) (citing *Hohe v. Casey*, 956 F.2d 399, 409 (3d Cir.1992)). If *Hudson* arbitrators do their job properly, it seems to us, the probability is that some of these controversies will not reach the courts at all.

The defendant unions have invited our attention to another case, *Miller v. Air Line Pilots Assn.*, No. 91–3161 (D.D.C. August 30, 1995) (unpublished), where the "waste of time and money" argument received a more favorable reception. The *Miller* court went so far as to hold, indeed, as a matter of "judicial discretion," that arbitration remedies made available by a union under *Hudson* must be exhausted as a precondition to any non-member's bringing a civil rights action under § 1983. If the exhaustion principle were to be applied in the case before us, of course, only three of the 236 non-members who objected to the agency fee would have standing to challenge the amount of the fee in court.

In support of its ruling on the exhaustion issue, the *Miller* court quoted extensively from a decision issued in the *Hudson* litigation by the United States Court of Appeals for the Seventh Circuit following remand from the Supreme Court. *Hudson v. Chicago Teachers Union*, 922 F.2d 1306 (7th Cir.), cert. denied, 501 U.S. 1230, 111 S.Ct. 2852, 115 L.Ed.2d 1020 (1991). The quoted passage begins with this sentence:

"Requiring the Federal courts to micromanage the fee calculation in every case challenging a union's [agency] fee would place an overwhelming and unrealistic bur-den on the courts." *Hudson*, 922 F.2d at 1314.

Taken out of context, the passage sounds like a powerful argument in favor of an exhaustion requirement. In fact, however, we have no reason to suppose that this was what the Seventh Circuit panel had in mind.

The question being addressed by the panel was whether the notice containing the union's explanation of the basis on which the amount of the agency fee had been determined was adequate to pass constitutional muster. The plaintiffs were arguing not only that the notice was inadequate—a proposition they did not push very hard—but also that the correctness of the amount had to be adjudicated in court *before the fee could be collected and escrowed in the first instance*. That was the argument to which the Seventh Circuit panel was responding, as is clear from the sentence immediately before the passage quoted in *Miller*:

"Taken in its entirety, plaintiffs' challenge asserts that a *prior* hearing and *prior* judicial determination of the correctness of [an agency] fee is a precondition to the *collection* of the fee." *Hudson*, 922 F.2d at 1314. (Emphasis supplied.)

In rejecting the plaintiffs' argument, the Seventh Circuit panel did not hold that exhaustion of the arbitral remedy could be required as a condition to the bringing of a § 1983 action. The exhaustion issue was not before the panel at all, as we understand it.

In any event, a panel of our own court has squarely rejected the proposition that it is constitutional for an agency shop agreement to require objecting employees to exhaust their arbitration remedies before going into court on their constitutional claims. *Tierney v. City of Toledo*, 917 F.2d 927, 939–40 (6th Cir.1990) (endorsing a district court's resolution of a comparable issue in *Lowary v. Lexington Local Bd. of Educ.*, 704 F.Supp. 1456 (N.D.Ohio 1988), aff'd on other grounds, 903 F.2d 422 (6th Cir.), cert. denied, 498 U.S. 958, 111 S.Ct. 385, 112 L.Ed.2d 396 (1990)).

In the case at bar the district court quoted language from this court's decision in *Low-ary*—language that was also quoted in *Weaver v. University of Cincinnati*, 970 F.2d 1523

(6th Cir.1992), *cert. denied,* 507 U.S. 917, 113 S.Ct. 1274, 122 L.Ed.2d 668 (1993)—to the effect that "the Supreme Court has suggested that courts should not involve themselves in factual inquiries involved in making a chargeability determination." *Lowary,* 903 F.2d at 433, and *Weaver,* 970 F.2d at 1535, citing *Allen,* 373 U.S. at 123–24, 83 S.Ct. at 1164–65, and *Abood,* 431 U.S. at 240, 97 S.Ct. at 1802, with a "see also" reference to a 1987 Sixth Circuit decision in the *Tierney* litigation, reported at 824 F.2d 1497, 1504–05. None of these cases can fairly be read as foreclosing the discovery sought by the plaintiffs here.

*Lowary* merely suggested that the district court was not required to conduct a trial to determine chargeability if an independent arbitrator had already made that determination and the plaintiff employees had not taken issue with the content of the arbitrator's decision. The plaintiffs in *Lowary,* as the panel was at pains to point out, "[did] not claim that the decisionmaker's determinations were improper." *Lowary,* 903 F.2d at 433. The *Lowary* plaintiffs were objecting only to "the use of the procedure," not to the substantive result produced thereby. *Id.*[3] In the case at bar, by contrast, the plaintiffs *are* objecting to the substantive result reached by the arbitrator; here the plaintiffs do indeed "claim that the decisionmaker's determinations were improper."

The pertinent challenge to the arbitrator's decision in *Weaver* was based on a "sequence of adjudication" argument; the plaintiffs contended that "an arbitrator should not determine which portion of the exacted fees were chargeable to nonmember employees before a district court decides the merits of a constitutional challenge to the union's collection procedures." *Weaver,* 970 F.2d at 1534. The *Weaver* panel rejected that argument, relying on the reasoning of *Hudson* and *Lowary.* *Weaver,* 970 F.2d at 1535. No corresponding argument has been presented in the case at bar.

The *Weaver* panel was not called upon to decide whether employees taking exception to the merits of arbitral chargeability determinations can be denied the right to probe the factual underpinnings of summary exhibits on which the arbitrator relied in making such determinations. *Weaver,* as we read it, simply does not support the denial of discovery in the case at bar. Neither does *Allen,* 373 U.S. at 123–24, 83 S.Ct. at 1164, where the Court merely "remind[ed] the parties of the availability of more practical alternatives to litigation," or *Abood,* 431 U.S. at 240, 97 S.Ct. at 1802, which echoed *Allen,* or *Tierney,* 824 F.2d at 1504–05, where the point deemed "important" by the court was that "the dissenting non-union member can be compelled through arbitration or otherwise to pay for only those sums which are fairly attributable to [collective bargaining] agreement-related purposes...." *Id.* at 1505.

Given the importance of the constitutional interests at stake in the case at bar, the district court should not have decided the summary judgment motion without allowing meaningful discovery first. In declining to allow any discovery beyond the arbitration record and the election forms, it seems to us, the district court clearly abused its discretion.

### III

■■■ The plaintiffs claim to have identified two categories of expenditures that ought to have been held non-chargeable as a matter of law: expenditures for "extra-unit litigation" and for "defensive organizing."

Extra-unit litigation means litigation that does not directly concern the particular bar-

---

**3.** The *Lowary* panel also pointed out that under *Hudson,* a chargeability determination by an independent arbitrator would not receive preclusive effect in a subsequent § 1983 action. The panel went on to note that the arbitrator's determination "likely would be entitled to great weight," 903 F.2d at 433 n. 3, but this obviously presupposes a determination based on an adequate and reliable record.

In the case at bar, further discovery may show both that the summaries on which the arbitrator relied were accurate and that the expenses summarized therein were incurred for purposes that qualified as chargeable under the tests prescribed by the Supreme Court. To the extent that the summaries gave the arbitrator an accurate picture of the underlying facts, and assuming reasonable competence on the part of the arbitrator, the arbitrator's decision will likely be entitled to great weight in that event.

gaining unit in which the objecting employee works. Whether the objecting employee can be required to contribute to the cost of such litigation proved to be a difficult question for our panel in light of the Supreme Court's fractured decision in *Lehnert*, 500 U.S. 507, 111 S.Ct. 1950. The question has now been answered in the affirmative by *Reese v. City of Columbus*, 71 F.3d 619 (6th Cir.1995), however, and *Reese* is binding on us under our circuit precedent rule. On remand, therefore, reasonable extra-unit litigation costs should be treated as chargeable.

■ Defensive organizing, as used here, covers a wide range of activities designed to protect and strengthen the status of unions that have already achieved bargaining agent recognition. The rubric includes, among other things, membership retention efforts, resistance to decertification proceedings, and defense against challenges from other unions.

In *Ellis* the Supreme Court held that it would be "perverse" to allow unions to force objecting nonmembers to fund the union's "costs of attempting to convince them to become members." *Id.*, 466 U.S. at 452 n. 13, 104 S.Ct. at 1894 n. 13. We think it would be equally perverse to require the plaintiffs to help underwrite actions designed solely to allow the union to perpetuate itself by maintaining the loyalties of existing members. See *Reese v. City of Columbus*, 798 F.Supp. 463, 470 (S.D.Ohio 1992), *rev'd on other grounds*, 71 F.3d 619, where the court explained that "[d]efensive organizing would serve only the union's self-interest in perpetuating itself as the sole representative of the bargaining unit, a goal which is not germane to collective bargaining activity and which may add to the burden on an objector's First Amendment rights since the objector may favor some other union or no union." On remand, defensive organizing costs that serve only this purpose should be treated as non-chargeable.

■ The plaintiffs contend that there is a genuine issue of material fact, at least, as to whether certain categories of administrative costs that were treated as chargeable in their entirety should instead have been allocated proportionally between chargeable and non-chargeable activities, as were other overhead costs. We agree. In opposing the motion for summary judgment, the plaintiffs submitted an affidavit in which Irving B. Ross, a certified public accountant with a wealth of relevant experience, raised serious questions about the treatment of the administrative costs at issue. These questions should be addressed by the district court after the plaintiffs have had a reasonable opportunity to conduct discovery.

The plaintiffs further contend that there is a genuine issue of fact as to the reasonableness of the method used by the unions in calculating the chargeable portion of two programs—known as "UniServ" and the "Unified Legal Service Program"—under which the National Educational Association makes grants to its state affiliates. Expenditures for these programs were allocated according to the chargeable percentage of funds given to the Michigan Education Association, and not according to the chargeable percentage of funds given across the country.

The plaintiffs' expert witness, Mr. Ross, expressed the opinion in his affidavit that "there is no basis in generally accepted accounting procedures that supports allocating all of NEA's UniServ and ULSP expenditures based on percentages derived from a single agency fee state affiliate...." Mr. Ross did not explain how he reached this conclusion, however, and on the record before us we are constrained to say that the allocation method used by the unions appears reasonable.

Finally, the plaintiffs point out that they filed a motion for class certification that was denied solely because the grant of summary judgment rendered it moot. The motion will not be moot when the summary judgment is vacated, of course, and we assume that the district court will revisit the class certification question in due course.

For the reasons stated we **VACATE** the order in which the plaintiffs' complaint was dismissed pursuant to Rule 56, Fed.R.Civ.P., and we **REMAND** the case for further proceedings not inconsistent with this opinion.